**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, and Local 134, International Brotherhood of Electrical Workers, AFL–CIO, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 641, 622, 759, 820, and 1263, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Florida Power & Light Company, Intervenor.**

**Nos. 71–1559, 71–1712.**

United States Court of Appeals, District of Columbia Circuit.

Jan. 5, 1973.

Before, BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

### ORDER

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, and Local 134, International Brotherhood of Electrical Workers, AFL–CIO, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCALS 641, 622, 759, 820 and 1263, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Florida Power & Light Company, Intervenor.**

**Nos. 71–1559, 71–1712.**

United States Court of Appeals, District of Columbia Circuit.

Reargued Jan. 23, 1973.

Decided June 29, 1973.

Certiorari Granted Jan. 21, 1974. See 94 S.Ct. 913.

Leventhal, Circuit Judge, filed concurring opinion in which McGowan, Circuit Judge, joined; MacKinnon, Circuit Judge, filed dissenting opinion in which Tamm, Robb and Wilkey, Circuit Judges, joined.

Laurence J. Cohen, Washington, D. C., for petitioners in No. 71–1559.

Seymour A. Gopman, Miami Beach, Fla., for petitioners in No. 71–1712.

Daniel M. Katz, Atty., N. L. R. B., with whom Marcel Mallet-Prevost, Asst. Gen. Counsel, and Warren M. Davison, Deputy Asst. Gen. Counsel, N. L. R. B., were on the brief, for respondent.

Ray C. Muller, Miami, Fla., for intervenor in No. 71–1712.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting *en banc*.

J. SKELLY WRIGHT, Circuit Judge:

 These cases were consolidated and heard *en banc* to resolve an important question of first impression arising under the National Labor Relations Act: Does a union commit an unfair labor practice under Section 8(b)(1)(B), 29 U.S.C. § 158(b)(1)(B) (1970), by disciplining supervisor-members for crossing a picket line and performing rank-and-file struck work during a lawful economic strike against the company? The National Labor Relations Board answered the question in the affirmative and issued cease and desist and other orders against the unions involved.[1] We reverse, deny enforcement of the Board's orders, and remand both cases to the Board with instructions to dismiss the complaints.

Although the issue, as stated above, is a legal question of statutory construction, we think it helpful to have a full understanding of the factual context in which the issue arose in the two cases before us.

*Florida Power & Light Co., No. 71–1712*

The Florida Power & Light Company has, since 1953, maintained a collective bargaining agreement with the International Brotherhood of Electrical Workers, AFL–CIO, through the union's System Council U–4 comprising the local unions involved in this case.[2] There was no provision in the collective bargaining agreement requiring employees to become members of the union as a condition of employment, and union membership was accordingly voluntary. Section 14(a) of the Act, 29 U.S.C. § 164(a) (1970),[3] provides that an employer shall not be compelled to deem supervisors as employees for the purpose of collective bargaining. In addition, Section 2(3)[4] exempts supervisors, as defined in Section 2(11),[5] from the defi-

---

1. *See* Int. Brhd of Electrical Wkrs System Council U–4, 193 NLRB No. 7 (1971)·; Int. Brhd of Electrical Wkrs, 192 NLRB No. 17 (1971).

2. System Council U–4 in fact comprises 12 local unions, only 5 of which are involved in the present controversy. The Board entered its order only against the locals involved, not against the Council.

3. "Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be com-

pelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining."

4. 29 U.S.C. § 152(3) (1970): "The term 'employee' * * * shall not include any individual employed as * * * a supervisor * * *."

5. 29 U.S.C. § 152(11): "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline

nition of "employee" in the Act, thereby depriving supervisors of the protections of the Act and permitting an employer to refuse to hire union members as supervisors [6] and to refuse to engage in collective bargaining with its supervisors.[7] Florida Power chose not to exercise its rights under these sections and recognized the union as the exclusive bargaining representative for many of its supervisory employees. They were considered part of the bargaining unit and their wages and conditions of employment were set out in the bargaining agreement.

Other higher ranking supervisors were not represented by the union for collective bargaining purposes and did not have their wages and conditions of employment determined by the collective bargaining agreement. These included supervisors in the positions of District Supervisor, Assistant District Supervisor, Assistant Supervisor, Plant Superintendent, Plant Supervisor, Assistant Plant Superintendent, Distribution Assistant, Results Assistant, Assistant Plant Engineer, Substation Supervisor, and some miscellaneous supervisory classifications. The company, however, also permitted these higher ranking supervi-

sors, many of whom had attained high ranking supervisory status after passing through the rank and file and through lower bargaining unit supervisory classifications, to maintain their union membership. It is with these high ranking supervisors who, though union members, were not represented by the union for collective bargaining purposes that the present case is concerned.[8]

Although their wages and conditions of employment were not negotiated for them by the union, these supervisors nevertheless received substantial benefits from union membership. In particular, union membership in good standing gave them the right to participate in the System Council Death Benefit Fund [9] and made them eligible for pension, disability, and death benefits under the terms of the International's constitution.[10]

A small number of the supervisors involved in this case were union members who paid no dues because they had obtained withdrawal cards from the union. Some had apparently obtained "honorary" withdrawal cards, under the terms of which the member did not actively participate in the union and did not pay monthly dues. The card constitutes a

other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

6. *See* Carpenters District Council of Milwaukee County v. NLRB, 107 U.S.App. D.C. 55, 57, 274 F.2d 564, 566 (1959) ; A. H. Bull Steamship Co. v. National Marine Engineers' Beneficial Assn, 2 Cir., 250 F.2d 332, 339 (1957) ; NLRB v. Edward G. Budd Mfg. Co., 6 Cir., 169 F.2d 571, 579 (1948), cert. denied, 335 U.S. 908, 69 S.Ct. 411, 93 L.Ed. 441 (1949).

7. *See* L. A. Young Spring & Wire Corp. v. NLRB, 82 U.S.App.D.C. 327, 163 F. 2d 905 (1947), cert. denied, 333 U.S. 837, 68 S.Ct. 607, 92 L.Ed. 1121 (1948).

8. The union also disciplined bargaining unit supervisors for crossing the picket

line and performing rank-and-file struck work. The Board, however, did not attempt to base its unfair labor practice finding on union discipline of these members, expressly excluding this aspect of the case by stipulation. *See* Joint Appendix at 57. We might note, however, that under the Board's approach § 8(b) (1) (B) would bar union discipline of supervisor-members whose wages and conditions of employment are covered by the collective bargaining agreement. *See generally* pp. 1168, 1169 *infra.*

9. Under the terms of the Fund's by-laws, upon the death of any member the deceased's beneficiary would receive benefits equal to one dollar times the number of members of the Fund in good standing during the month prior to the member's death. Money with which to pay the benefits was obtained by assessing each member one dollar upon the death of any other member.

10. These benefits were funded from the monthly dues required of every member.

valuable benefit, however, as it permits the holder, in the event he loses his supervisory position and returns to the rank and file, to return to active membership without paying the initiation fee normally required of new members, simply by returning the withdrawal card and resuming payment of dues. It was the practice of the System Council Death Benefit Fund to permit supervisors who had obtained honorary withdrawal cards to continue their participation in the Fund. Other supervisors had apparently obtained "participating" withdrawal cards. Under the International constitution, these members could not actively participate in the union, but continued to pay a monthly fee equal to normal monthly dues, and therefore continued to remain eligible for pension, death, and disability benefits.[11]

All union members, including those on withdrawal cards,[12] bore certain obligations under the union's constitution, which provides that "[a]ny member may be penalized for committing any one or more" of 23 listed offenses. The offenses most relevant to the present case are "(10) Working in the interest of any organization or cause which is detrimental to, or opposed to, the I.B.E.W." and "(21 Working for any individual or company declared in difficulty with a [local union] or the I.B.E.W., in accordance with this Constitution." In the collective bargaining agreement, however, the union made certain concessions with respect to union discipline of supervisor-members. The contract provides:

" * * * It is further agreed that employees in [supervisory] classifications have definite management responsibilities and are the direct representatives of the Company at their level of work. Employees in these classifications and any others in a supervisory capacity are not to be jacked up or disciplined through Union machinery for the acts they may have performed as supervisors in the Company's interest. The Union and the Company do not expect or intend for Union members to interfere with the proper and legitimate performance of the Foreman's management responsibilities appropriate to their classification. * * * "

From October 22, 1969 through December 28, 1969, the union was engaged in an economic strike against the company, and the local unions maintained picket lines at nearly all of the company's operational facilities. Many supervisor-members crossed the picket lines and performed rank-and-file struck work—that is, work normally performed by nonsupervisory employees when no strike is in progress.[13] Whether they crossed the picket line at the request of the company or totally of their own volition is not revealed in the record. The union brought charges for violations of the union's constitution, and those found guilty of crossing the picket line to perform rank-and-file struck work received fines of from $100 to $6,000. Most were also expelled from the union, thereby losing their right to continue participating in the System Council Death Benefit Fund. By expulsion they were also deprived of the membership in good standing which was a prerequisite for receiving pension, disability, or death benefits under the International constitution.[14]

---

11. *See* note 10 *supra.*

12. Art. XXVI, § 5 of the International Constitution provides:
 "The validity of any withdrawal card shall be dependent upon the good conduct of the member. * * *
 "A member on a withdrawal card may be subject to charges, trial and appropriate penalty in accordance with provisions of this Constitution."

13. It is conceded that the union did not fine those supervisors, if any, who crossed the picket line solely to perform their usual supervisory functions.

14. We intimate no views concerning the reasonableness of the fines or expulsions. Such matters are not within the Board's jurisdiction under § 8(b)(1) but rather may be litigated in appropriate state court proceedings. *See generally* NLRB v. Boeing Co., 412 U.S. 67, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973).

The Board found that in so disciplining supervisor-members the union violated Section 8(b)(1)(B) because the fines "struck at the loyalty an employer should be able to expect from its representatives for the adjustment of grievances and therefore restrained and coerced employers in their selection of such representatives." Int. Brhd of Electical Wkrs System Council U–4, 193 NLRB No. 7 (slip opinion at 6) (1971). Accordingly, the Board ordered the union to cease and desist, rescind all fines, expunge all records of disciplinary proceedings, restore union membership, restore eligibility in all benefit plans, and post appropriate notices.

*Illinois Bell Telephone Co., No. 71–1559*

The Illinois Bell Telephone Company and its predecessors have, since 1909, maintained a contractual relationship with Local 134, International Brotherhood of Electrical Workers, AFL–CIO. Illinois Bell, like Florida Power, chose not to exercise its right under Sections 2 (3), 2(11), and 14(a) of the Act to refuse to hire union members as supervisors. The union was recognized as the exclusive bargaining representative, not only for rank-and-file journeymen and apprentice employees, but also for employees within certain supervisory categories, including General Foreman, P. B.X. Installation Foreman, and Building Cable Foreman. These supervisors, as well as rank-and-file members of the bargaining unit, were required to become and remain members of Local 134 under the terms of a union security clause agreed to by the company in the collective bargaining agreement.

As recently as 1959, the collective bargaining agreements had prescribed monthly wage rates applicable to these foremen. Contracts since then have not contained such wage provisions, but the bargaining agreement in effect at the time of the instant dispute included a section entitled "Working Conditions for

General Foremen and Foremen," which concerned payment for overtime work and for certain absences. Other provisions of the agreement, for example that dealing with vacations, were found by the trial examiner to be applicable to foremen as well as to rank-and-file employees.[15]

Other higher ranking supervisors were not part of the bargaining unit and were not represented by the union for collective bargaining purposes. None of their conditions of employment were determined by the bargaining agreement. These included employees in the positions of District Installation Superintendent, Plant Assignment Foreman, and Test Center Foreman. The company also permitted these higher ranking supervisors to maintain their union membership. In fact, in 1954, when the position of District Installation Superintendent was first created, the company and the union signed a Letter of Understanding, apparently still in force, providing that

"[a]s District Installation Superintendents * * * their wages and conditions of employment will not be a matter of union-management negotiations but They [*sic*] will not be required to discontinue their membership in the union as it is recognized that they have accumulated a vested interest in pension and insurance benefits as a result of their membership in the union. * * * "

In contrast to *Florida Power,* we are here concerned with supervisors both in and out of the bargaining unit.

All supervisor-members received substantial benefits from union membership. Those in the bargaining unit benefitted in having the union act as their representative for collective bargaining purposes, including the benefit of any contract provisions obtained on their behalf by the union. Those both in and out of the bargaining unit benefitted from participation in the International's

15. *Int. Brhd of Electrical Wkrs, supra* note 1, 192 NLRB No. 17 (trial examiner's decision at 3).

pension benefit and death benefit plans and from participation in group life insurance and old age benefit plans sponsored by Local 134. As in *Florida Power*, some supervisor-members apparently were no longer active dues-paying members but had obtained withdrawal cards. But, as indicated earlier, those on withdrawal cards continued to benefit under certain of the benefit plans.

The same International union is involved in both cases, and union members of Illinois Bell bore the same obligations under the International's constitution as were described earlier. In contrast to the *Florida Power* case, however, there was no provision in the Illinois Bell collective bargaining agreement in which the union purported to make any concessions with respect to union discipline of supervisor-members. The only related provision is in the 1954 Letter of Understanding which, after recognizing that those serving as District Installation Superintendents will be permitted to continue union membership, provides:

"However, any allegiance they owe to the union shall not affect their judgment in the disposition of their supervisory duties. Since they will have under their supervision employees who are members of unions other than Local 134 and perhaps some with no union affiliations whatever, the company will expect the same impartial judgment that it demands from all Supervisory personnel."

Between May 8, 1968 and September 20, 1968, Local 134 engaged in an economic strike against the company. At the inception of the strike, the company informed supervisory personnel that it would like to have them come to work during the work stoppage, but it told them the decision whether to work or to respect the strike was a matter left to the personal discretion of each individual. Indeed, the employer indicated that those who chose not to work would not be penalized. In contrast, Local 134 warned its supervisor-members, at a union meeting held immediately before the strike, that they would be subject to union discipline if they performed rank-and-file work during the strike. During the course of the strike, some of the supervisor-members crossed the union's picket line to perform rank-and-file struck work, while other supervisors honored the strike and stayed away from work. Local 134 carried out its pre-strike warning and brought disciplinary actions against a number of supervisors. Those who were found guilty of performing rank-and-file work during the strike were each fined $500. Unlike *Florida Power*, apparently no supervisors were expelled from the union or denied the right to continue participating in various union benefit plans. Local 134 has commenced suit in the Illinois courts to collect some of the fines, but insofar as any supervisors have paid any part of the fines the company has reimbursed them.

The Board found that in so disciplining supervisor-members the union violated Section 8(b)(1)(B) because "the underlying dispute giving rise to the fines was between the Union and Illinois Bell rather than between the Union and its supervisor-members." Int. Brhd of Electrical Wkrs, 192 NLRB No. 17 (slip opinion at 7) (1971). The Board referred to its decision in a case consolidated with *Illinois Bell* for purposes of oral argument before the Board in which it had said:

" * * * The intent [of Section 8(b)(1)(B)] is to prevent the supervisor from being placed in a position where he must decide either to support his employer and thereby risk internal union discipline or support the union and thereby jeopardize his position with the employer. To place the supervisor in such a position casts doubt both upon his loyalty to his employer and upon his effectiveness as the employer's collective-bargaining and grievance adjustment representative. The purpose of Section 8(b)(1)(B) is to assure to the employer that its selected collective-bargaining representatives will be completely faithful to its desires. This

cannot be achieved if the union has an effective method, union disciplinary action, by which it can pressure such representatives to deviate from the interests of the employer. * * * " Local Union No. 2150, Int. Brhd of Electrical Wkrs, 192 NLRB No. 16 (slip opinion at 7) (1971). Accordingly, the Board ordered the union to cease and desist, rescind all fines, expunge all records of disciplinary proceedings, and post appropriate notices.

## I

Section 8(b)(1)(B) provides: "It shall be an unfair labor practice for a labor organization or its agents * * * to restrain or coerce * * * *an employer* in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances * * *." (Emphasis added.) The purpose of this provision is clear on its face. It is designed to prevent unions from restricting management's free choice of its agent to bargain with the union or adjust grievances. Under the Act, each party to the collective bargaining process has a right to choose its representative, and there is a correlative duty on the opposite party to negotiate with the appointed agent. *See* NLRB v. Int. Ladies Garment Wkrs Union, 3 Cir., 274 F.2d 376 (1960).

The legislative history of the section is fully consistent with this literal reading. The Senate Report says that the section

"proscribes unions and their agents from interfering with, restraining, or coercing employers in the selection of their representatives for the purposes of collective bargaining or the settlement of grievances. * * * [T]his subsection would not permit a union to dictate who shall represent an employer in the settlement of employee grievances, or to compel the removal of a personnel director or supervisor who has been delegated the function of settling grievances."

1 Legislative History of the Labor Management Relations Act (hereinafter "Legis.Hist.") 427 (1948). Senator Taft gave an appropriate example of the kind of activity the section was designed to proscribe:

"This unfair labor practice referred to is not perhaps of tremendous importance, but employees cannot say to their employer, 'We do not like Mr. X, we will not meet Mr. X. You have to send us Mr. Y.' That has been done. It would prevent their saying to the employer, 'You have to fire Foreman Jones. We do not like Foreman Jones, and therefore you have to fire him, or we will not go to work.' * * * "

2 Legis.Hist. 1012. Senator Ellender echoed the same concerns:

" * * * [Q]uite a few unions forced employers to change foremen. They have been taking it upon themselves to say that management should not appoint any representative who is too strict with the membership of the union. This amendment seeks to prescribe a remedy in order to prevent such interferences."

Another concern expressed in the legislative history involves unions forcing management to bargain through a multi-employer association.

" * * * [A] union or its responsible agents could not, without violating the law, coerce an employer into joining or resigning from an employer association which negotiates labor contracts on behalf of its members * * *."

1 Legis.Hist. 427.

" * * * Under this provision it would be impossible for a union to say to a company, 'We will not bargain with you unless you appoint your national employers' association as your agent so that we can bargain nationally.' Under the bill the employer has a right to say, 'No, I will not join in national bargaining. Here is my representative, and this is the man you have to deal with.' * * * "

2 Legis.Hist. 1012 (remarks of Senator Taft).

For over 20 years since its enactment in 1947, Section 8(b)(1)(B) interpretations by the Board faithfully followed its literal language and this legislative history. The cases decided by the Board involved attempts either to force employers into or out of multi-employer associations, *see, e. g.,* United Slate, Tile, etc. Wkrs. Assn, Local 36 (Roofing Contractors Assn of Southern California), 172 NLRB No. 249 (1968); Orange Belt District Council of Painters No. 48 (Painting & Decorating Contractors of America, Inc.), 152 NLRB 1136 (1965), or to force dismissal of an employer bargaining representative or grievance adjuster considered objectionable because of his tough, anti-union attitude, *see, e. g.,* Local 986, Teamsters Union (Tak-Trak, Inc.), 145 NLRB 1511 (1964); Los Angeles Cloak Joint Board, ILGWU (Helen Rose Co.), 127 NLRB 1543 (1960). *See also* NLRB v. Local 294, Int. Brhd of Teamsters, 2 Cir., 284 F. 2d 893 (1960).

That the present cases lie outside this original understanding of Section 8(b)(1)(B) seems obvious. There was no claim or showing in either case that the purpose of disciplining the supervisors was to get management to replace them. There is no indication that replacement of the fined supervisors was even a likely result of the union discipline. Indeed, just the opposite seems the case. In *Illinois Bell,* at the inception of the strike management expressly told all supervisors that no reprisals would be taken against those observing the picket line, and after the strike management promoted many of those who chose not to cross the picket line to perform rank-and-file work. Nor is there any indication in *Florida Power* that the company replaced any striking supervisors. The only purpose and likely effect of the imposition of union discipline was to force the supervisors to observe the picket line to the extent of not performing struck work for the employer. If anyone was restrained or coerced, it was the supervisors, not their employer.

Since 1968, however, the Board has embarked upon a new approach in applying Section 8(b)(1)(B), expanding its scope far beyond the situations encompassed in this original understanding. The process began with the Board's decision in San Francisco-Oakland Mailers' Union No. 18, 172 NLRB No. 252 (1968). In *Oakland Mailers,* management charged the union with attempting to discipline a foreman for the manner in which he interpreted the collective bargaining contract in making work assignments for the employees under his supervision. Although there was no allegation that the union was attempting to coerce the employer into hiring a new representative for collective bargaining and adjustment of grievances, the Board nonetheless found a Section 8(b)(1)(B) violation. The union's actions, according to the Board, "were designed to change the [company's] representatives from persons representing the viewpoint of management to persons responsive or subservient to [the union's] will." Slip opinion at 2. This was the sort of pressure which Section 8(b)(1)(B) was designed to prevent. "That [the union] may have sought the substitution of attitudes rather than persons, and may have exerted its pressure upon the [company] by indirect rather than direct means, cannot alter the ultimate fact that pressure was exerted here for the purpose of interfering with the [company's] control over its representatives. Realistically, the [company] would have to replace its foremen or face *de facto* nonrepresentation by them." *Id.* at 3.

■■ Although the *Oakland Mailers* doctrine unquestionably expanded Section 8(b)(1)(B) to cover situations not envisioned by the section's enactors, we have recognized and continue to recognize that its basic rationale is consistent with the purposes of Section 8(b)(1)(B). *See* Dallas Mailers Union, Local No. 143 v. NLRB, 144 U.S.App.D.C. 254, 445 F.2d 730 (1971). Where a supervisor is disciplined for the manner in which he performed his collective bargaining

and grievance adjustment functions, the union's purpose in imposing such discipline and the discipline's likely effect is to change the manner in which the supervisor performs those functions in the future. Discipline therefore achieves by indirect means what Section 8(b)(1)(B) clearly was intended to prevent. It permits the union to get a supervisor who is not "too strict with the membership of the union," *see* page 1152 *supra*, not by changing the identity of the supervisor, but by changing the attitude the supervisor brings to his grievance adjustment and collective bargaining tasks. Although Section 8(b)(1)(B) speaks literally in terms of coercing the "selection" of employer representatives, it is clear that management's right to a free selection would be hollow indeed if the union could dictate the manner in which the selected representative performed his collective bargaining and grievance adjustment duties.

In several cases decided after *Oakland Mailers*, the Board continued to apply Section 8(b)(1)(B) to union attempts to discipline supervisors for the manner in which they performed their collective bargaining or grievance adjustment functions. In some of these cases fines had been imposed "for the manner in which the [foreman] had interpreted and administered" the collective bargaining agreement, Toledo Locals Nos. 15-P & 272. Lithographers & Photoengravers Int. Union (Toledo Blade Co.), 175 NLRB 1072 (1969), enforced, 6 Cir.,

437 F.2d 55 (1971), or where the union had "sought, [by an internal union procedure], to enforce its viewpoint as to the meaning of the contract," Sheet Metal Wkrs Int. Assn, Local Union 49 (General Metal Products, Inc.), 178 NLRB 139, 142 (1969), enforced, 10 Cir., 430 F.2d 1348, 1350 (1970). *See also* Houston Typographical Union No. 87, 182 NLRB 592 (1970); [16] Freight, Constr., Gen. Drivers, Warehousemen & Helpers Union (Grinnell Co. of the Pacific), 183 NLRB No. 49 (1970); [17] New Mexico District Council of Carpenters & Joiners (A. S. Horner, Inc.), 176 NLRB 797 (1969), enforced, 10 Cir., 454 F.2d 1116 (1972).[18] In another case a foreman was fined for being too strict with one of the employees under his supervision, and the record clearly indicated that the union desired to have the foreman replaced. *See* Dallas Mailers Union, Local No. 143 v. NLRB, *supra*, enforcing 181 NLRB 286 (1970).

A common theme emerges from these cases which at once defines the scope of the *Oakland Mailers* doctrine and relates that doctrine to the core concerns of Section 8(b)(1)(B). In each, "[t]he relationship between the Union and its members * * * [was] used as a convenient and, it would seem, powerful tool * * * to compel the Employer's foremen to take pro-union positions in interpreting the collective bargaining agreement." San Francisco-Oakland Mailers' Union No. 18, *supra*, 172 NLRB No. 252 (slip opinion at 4).[19]

16. "[T]he instant case involves discipline of a supervisor-member * * * for violation of the contract * * *." 182 NLRB at 595 (trial examiner's decision).

17. Here the underlying contract dispute between the union and the supervisor-member was whether certain work fell within the supervisor's job classification under the contract or within other employees' job classifications. 183 NLRB No. 49 (trial examiner's decision at 4 & 9).

18. In this case the union disciplined a supervisor-member who co-signed a letter urging employees to vote with management in an upcoming election. Obviously,

it is part of a supervisor's collective bargaining duties to urge management's viewpoint on union members. The union thus disciplined the supervisor for the effective performance of his collective bargaining function, bringing the case squarely within the *Oakland Mailers* rationale.

19. "There have been several cases dealing with the question whether the imposition by a union of a fine on an employer representative authorized to adjust grievances violates Section 8(b)(1)(B). In all these cases the Board found a violation. However, * * * they involved fines imposed on a supervisor because of his alleged violation of a

The cases before us, however, are critically different from those decided under *Oakland Mailers* and lie outside the rationale of that case and its progeny. In both cases here the union has disciplined supervisors, not for the way they interpreted the collective bargaining agreement, not for being too strict with union members, but simply for crossing a picket line to perform rank-and-file struck work. There is no underlying dispute relating to contract interpretation or grievance settlement in these cases, but rather an economic clash between union and employer totally unrelated to the manner in which supervisors perform their collective bargaining or grievance settlement functions. As the trial examiner in *Illinois Bell* pointed out, the previous cases are all

"readily distinguishable here where the action for which the supervisors were fined bore no direct relation to their work as supervisors or to any interpretation of the contract. As an original proposition I would be inclined to construe Section 8(b)(1)(B) as interdicting union fines of supervisors only when the conduct for which the supervisor was fined bore some relation to his role as a representative of management in 'collective bargaining or the adjustment of

collective bargaining contract, and the Board's rationale in those cases * * * was that the respondent union's action was designed to compel the supervisor 'to take pro-union positions in interpreting the collective-bargaining agreement.' It is apparent from this that the Board was influenced in those cases by the fact that the supervisor was disciplined for an alleged misinterpretation or misapplication of the contract, and that the natural and foreseeable effect of such discipline was that, in resolving future grievances over alleged contract violations, the supervisor would be reluctant to take a position adverse to that of the union * * *. * * * "
Local Union No. 453, Brhd of Painters, etc. (Syd Gough & Sons, Inc.), 183 NLRB No. 24 (1970) (trial examiner's decision at 3) (footnotes omitted).
Only one previously decided § 8(b)(1)(B) opinion cannot be squared with this

grievances,' to quote Section 8(b)(1)(B). In the instant case the question confronting the supervisors whether to work or to respect the strike call of their Union was in no way related to those subjects. Moreover, the Company itself had made it clear that it was not demanding that its supervisors work during the strike. On the contrary, the Company expressly left the decision up to each individual supervisor, with specific assurances that no reprisal would be visited on those who chose not to work. After the strike the Company promoted some of the supervisors who had not worked during the strike. I therefore find some difficulty in concluding that the Company was restrained or coerced by the Union's action in fining the supervisors who worked, or even in finding that the Union's action had any natural or inherent tendency to restrain or coerce the Company. * * * * "

192 NLRB No. 17 (trial examiner's decision at 9). And as Member Fanning pointed out in dissent:

"Here the supervisors were not fined because they gave directions to the work force, interpreted the collective-bargaining agreement, adjusted

rationale, but it is explainable on other grounds. In New Mexico District Council of Carpenters & Joiners of America (A. S. Horner, Inc.), 177 NLRB 500 (1969), enforced, 10 Cir., 454 F.2d 1116 (1972), a union member was fined for working as a supervisor for a company which had no contract with the union. In these circumstances, however, compliance by the supervisor with the union's demands would have meant quitting his job with the employer, thereby having "the effect of depriving the Company of the services of its selected representative for the purposes of collective bargaining or the adjustment of grievances." 177 NLRB at 502. The case thus falls close to the original rationale of § 8(b)(1)(B) which was to permit the employer to keep the bargaining representative of his own choosing. *See* text at pp. 1152, 1153, *supra*. *See also* Local Union No. 453, *supra*, 183 NLRB No. 24 (trial examiner's decision at 4).

grievances, or performed any other function generally related to supervisory activities, in a manner in disfavor with the Respondent Union. They were fined because they performed production work in the bargaining unit during a strike. Their Employer sought to use them, not in the direction of the work of employees who had not gone on strike or of replacements for strikers, but to replace the strikers themselves. In short, he assigned them to work as employees within the meaning of Section 2(3) of the Act, not as supervisors within the meaning of Section 2(11) of the Act. * * * "

192 NLRB No. 17 (slip opinion at 13).

The Board insists, however, that the present cases fall within the *Oakland Mailers* rationale. Its position is couched in vague but superficially appealing language. It is said that these fines "impinged on the loyalty" which the employer should be able to expect from his supervisors, *id.* at 6, that if they were found to be lawful they would permit the union "to drive a wedge between a supervisor and the Employer," Local Union No. 2150, Int. Brhd of Electrical Wkrs, *supra,* 192 NLRB No. 16 (slip opinion at 6), and that as a result an employer "could no longer count on the complete and undivided loyalty of those it had selected to act as its collective-bargaining agents or to act for it in adjusting grievances." *Id.* at 6–7. If we try to rephrase the Board's language in terms consistent with the rationale of *Oakland Mailers,* the Board's position seems to come down to the following propositions. By being forced to take sides with the union during any confrontation between union and employer, even one unrelated to performance of his collective bargaining or grievance adjustment functions, a supervisor becomes, or is likely to become, more loyal to the union and less loyal to the company. He is then likely to bring this shift in loyalties to his grievance adjustment or collective bargaining tasks in the future, thus achieving in the end precisely that which Section 8(b)(1)(B) and the *Oakland Mailers* doctrine were intended to prevent. In our view, the Board overestimates the risk that discipline for performing rank-and-file struck work will significantly affect performance of grievance adjustment and collective bargaining functions.

■ Discipline, or the threat thereof, may well force a supervisor to observe a picket line, but it is questionable whether it will turn him into a believer in the union's cause. The Illinois Bell Company apparently recognized as much when it promoted many of those supervisors who, under threat of union discipline, refused to cross the picket line to perform rank-and-file struck work. Our everyday experience tells us that the result of discipline is normally some degree of hostility toward the person or group imposing the discipline, and this commonsense analysis appears confirmed by the record in the cases before us. The result of threatened union discipline was to turn the supervisors against the union, not to ingratiate them into the union fold. This is even clearer when we look at expulsion as a disciplinary measure. Those who are expelled are obviously going to be more loyal to the company and less loyal to the union in the future. One who has resigned or been expelled from union membership owes no further obligations to the union. *See* NLRB v. Granite State Joint Board, Textile Wkrs Union of America, Local 1029, 409 U.S. 213, 93 S.Ct. 385, 34 L. Ed.2d 422 (1972). Therefore, not only is there no reason to conclude that those supervisors of Florida Power who were expelled from the union will be more lenient with the union when they are called upon to interpret the contract, adjust grievances, or engage in collective bargaining in the future. Just the opposite is likely to be the case.

■ More importantly, let us concede for the moment that in some manner, perhaps through the camaraderie of the picket line, a supervisor who is forced under threat of discipline to observe a

picket line undergoes a subtle change in attitude and comes to feel closer ties to the union. It still does not follow that this change in attitude will affect his performance of his collective bargaining or grievance adjustment functions. When a supervisor acts as such he is a representative of management, and as such he should be immune from union discipline. The unions participating in the present cases conceded as much at oral argument when they agreed that when a supervisor crosses a picket line to perform *supervisory* work he remains immune from discipline. But when· a supervisor foresakes his supervisory role to do rank-and-file work ordinarily ʾthe domain of nonsupervisory employees, he is no longer acting as a management representative and no longer merits any immunity from discipline. The dividing line between supervisory and nonsupervisory work in the present context is sharply defined and easily understood. There is accordingly no reason to believe that by being forced to take sides with the union in a dispute unrelated to the performance of his supervisory functions, and to take sides only to the extent of withholding his labor from rank-and-file nonsupervisory work, a supervisor will suffer· from a change in attitude when, after the strike, he returns to the performance of his normal supervisory duties. Despite the Board's protestations to the contrary, he is not put in the difficult position of serving the union and the employer at the same time. As the Board has noted in an analogous situation where supervisory and rank-and-file functions were "sharply demarcated," the supervisors "will not be 'serving two masters at the same time.' They will be serving them at different times." *See* Great Western Sugar Co., 137 NLRB 551, 553–554 (1962).

The foregoing analysis should serve to dispel any support the Board might have hoped to obtain from our recent decision in Meat Cutters Union Local 81 v. NLRB, 147 U.S.App.D.C. 375, 458 F.2d 794 (1972). In its decision in this case, Meat Cutters Union Local 81, 185 NLRB No. 130 (1970), the Board found a Section 8(b)(1)(B) violation when a union attempted to discipline a supervisory employee for obeying a company order to institute a new meat procurement policy which would have resulted in a loss of union jobs. *Meat Cutters* differed from *Oakland Mailers* in that no one claimed that the new procurement policy had anything to do with the supervisor's grievance settlement or collective bargaining functions. It was thus unclear how the Board could claim that any substitution of attitudes or shift in loyalties in violation of Section 8(b)(1)(B) as to these functions had occurred, particularly in view of its recent explicit rejection of a *per se* ban on all union discipline of supervisory employees. *See* Local Union 453 Brhd of Painters, etc. (Syd Gough & Sons, Inc.), 183 NLRB No. 24 (1970).

When *Meat Cutters* was appealed to this court we were clearly concerned that the Board's Section 8(b)(1)(B) decisions might be deteriorating into a flat prohibition against any union discipline of supervisors. Our objections to such a prohibition are explained in greater detail in Part III of this opinion, but suffice it for now to state that such an approach inequitably gives supervisory personnel all the benefits of union membership without having to bear any of the responsibilities. In its brief in *Meat Cutters*, however, the Board sought to meet these fears and dispel them. "[I]t is only when the representative's obligations to the union conflict with his management responsibilities that his union obligations are compelled to yield," the Board argued. "Thus, in each case, including the instant case, where the Board has found a Section 8(b)(1)(B) violation based on union discipline of a management representative, the conduct which prompted disciplinary action consisted of the representative's efforts to discharge his management reponsibilities. * * * In fact, the Board has recently dismissed a Section 8(b)(1)(B) complaint on the ground that the infraction of union rules for which the employer representative was disciplined did

not involve the exercise of supervisory or managerial authority." NLRB brief at 15 in Meat Cutters Union Local 81 v. NLRB, *supra*.

Partially on the basis of these representations we enforced the Board's decision, but with the explicit caveat that "[t]he rule here applied by the Board only affects union discipline which is imposed upon a member, who has responsibilities as a representative of his employer in administering the collective bargaining agreement or the adjustment of employee grievances, because he has performed duties as a management representative. * * * The N.L.R.B. has made it clear that a union may legally discipline a supervisor-member for acts which are *not* performed by the individual in furtherance of his obligations as the employer's representative." Meat Cutters Union Local 81 v. NLRB, *supra*, 147 U.S.App.D.C. at 379–380 n.12, 458 F.2d at 798–799 n.12 (Emphasis in original.)

Perhaps it is unfair to suggest that the Board is dissembling in seeking to draw some support for its present position from *Meat Cutters*, but certainly it is clear that the Board is changing its interpretation of the law to suit the case. *Meat Cutters* was an expansion of the *Oakland Mailers* doctrine, but it nevertheless was and remains directly tied to the principles *Oakland Mailers* properly implied from Section 8(b)(1)(B). The discipline of the supervisor in *Meat Cutters* was not totally unrelated to the performance of grievance settlement functions since by fining the supervisor the union was avoiding and undercutting a clause in the contract that provided that all matters pertaining to the proper application of the agreement shall be handled by certain grievance-arbitration procedures spelled out in the agreement. *See* 147 U.S.App.D.C. at 378 n. 6, 458 F.2d at 797 n.6. More importantly, the underlying dispute was one of contract interpretation since the union's basic position was that the new meat procurement policy which the supervisor was fined for enforcing violated the collec-

tive bargaining agreement. *See* 147 U. S.App.D.C. at 378, 458 F.2d at 797. Discipline was used, in effect, as a tool to enforce the union's interpretation of the collective bargaining agreement. *See* pages 1154, 1155 *supra*. In the present cases, by contrast, no question of grievance settlement or contract interpretation is either directly or indirectly involved. The underlying dispute is not one of contract interpretation but simply a lawful economic strike against the company to get a better contract.

The Board, in a final attempt to bring this case within the holding of *Meat Cutters*, argues that crossing the picket line to perform rank-and-file work is part of a supervisor's management function. The Board claims that management "considered its supervisors among those it could depend on" during a strike, and that the employer "had a right to expect the supervisor" to cross the picket line and perform rank-and-file struck work. Local Union No. 2150, Int. Brhd of Electrical Wkrs, *supra*, 192 NLRB No. 16 (slip opinion at 6). But saying that rank-and-file labor is part of a management function is tantamount to saying that black is white. Whatever the parameters of *Meat Cutters'* "management function" test may be, the term "management function" has no meaning except in contrast to the concept of rank-and-file work. And the Board's reference to management's "right" to expect supervisors to perform rank-and-file work is nothing but a facade by which the Board hopes to avoid analysis by assuming the answer to the question before it.

Try as one might, then, there is simply no way to derive the Board's decision in these cases from the literal language of Section 8(b)(1)(B), from the legislative history, or from the gloss that has been added to that section by *Oakland Mailers* and subsequent cases. The Board's decision in these cases, in the words of the learned trial examiner in *Illinois Bell*, "stretch[es] the statute beyond what I would otherwise consider the breaking point." Int. Brhd of Elec-

trical Wkrs, 192 NLRB No. 17 (trial examiner's decision at 11) (1971).

In the final analysis, the Board's position in these cases does not rest on the language of Section 8(b)(1)(B), *Oakland Mailers,* or *Meat Cutters,* but rather on a policy which the Board for the first time now finds imbedded in Section 8(b)(1)(B)—that supervisors who are permitted by their employer to join unions owe their undivided loyalty to their employer in any dispute between the union and the employer. That the Board has just discovered this policy some 20-odd years after enactment of Section 8(b)(1)(B) makes us naturally suspicious that any such policy exists, especially since it appears that union discipline of supervisors is a long-standing problem that labor and management have attempted to resolve in a collective bargaining context for many years.[20] The Board apparently derives this interpretation of the statute in large part from Sections 2(3) and 14(a) of the Act which, as noted earlier, deprive supervisors of the protections of the Act and give employers the right to refuse to hire union members as supervisors. The Board's analysis starts off correctly enough when it states that in enacting these sections Congress recognized that an employer should be able to keep his supervisors out of unions in order to ensure their undivided loyalty. But the Board is mistaken in leaping to the conclusion that this same objective should be furthered by interpreting Section 8(b)(1)(B) to preclude all union discipline of supervisor-members when the employer has permitted his supervisors to maintain union membership. We draw precisely the opposite conclusion from the interrelationship between Sections 2(3) and 14(a), on the one hand, and Section 8(b)(1)(B) on the other. When Congress recognized that an employer should be able to have supervisors who owe him their undivided loyalty, it gave the employer a specific means to achieve such loyalty—the right to refuse to hire union members as supervisors, or in other words, the right to require employees to relinquish union membership upon promotion to a supervisory position. Congress never intended the inequitable result of permitting supervisors to have it both ways—joining unions with the consent of their employer and obtaining all the advantages of union membership without assuming the basic obligations normally incident to such membership.

The policy questions raised in an analysis of the statutes are relevant not only in this context, but also in order to apply the principles set down in a line of Supreme Court cases concerning union discipline of members. Since, in our view, those cases control the ones before us, we now turn to consider the Supreme Court precedents and return in Part III to a discussion of the interrelationship between Section 8(b)(1)(B) and the exclusion of supervisors from the protections of the Act in Sections 2(3) and 14(a).

II

The Board's rough sailing through the complexities of Section 8(b)(1)(B) might, perhaps, be more understandable if the seas were entirely uncharted. But in fact union discipline of members who cross picket lines to do struck work has been the subject of a series of important Supreme Court decisions. The Board has considered these decisions in its past applications of Section 8(b)(1)(B), but inexplicably chose to ignore them in its decision in the present cases. The Supreme Court's decisions, unlike the Board's approach, set out a rational, workable interpretation of Section 8(b)(1) which balances a union's right to enforce reasonable discipline against the rights of employers and union members to be free from union overreaching.

The first and most important of these decisions is NLRB v. Allis-Chalmers

Manufacturing Co., 388 U.S. 175, 87 S. Ct. 2001, 18 L.Ed.2d 1123 (1967). In all relevant respects, *Allis-Chalmers* is indistinguishable from these cases. There, as here, the union sought to impose reasonable fines on union members who had crossed a picket line during a lawful strike. In *Allis-Chalmers*, however, none of the fined members were supervisors, so the relevant provision governing the union's conduct was subsection (A) of Section 8(b)(1) rather than subsection (B). However, when the Supreme Court found the union innocent of any unfair labor practice, it did so not because of anything peculiar to subsection (A), but rather because of its interpretation of the words "restrain or coerce" which are common to subsections (A) and (B). *See* Christensen, Union Discipline Under Federal Law: Institutional Dilemmas in an Industrial Democracy, 43 N.Y.U.L.Rev. 227, 268 (1968). Thus the Court stated: "It is highly unrealistic to regard § 8(b)(1), *and particularly its words 'restrain or coerce,'* as precisely and unambiguously covering the union conduct involved in this case." 388 U.S. at 179, 87 S.Ct. at 2006. (Emphasis added.) On the contrary, such a reading of Section 8(b)(1) would "attribute to Congress an intent at war with the understanding of the union-membership relation which has been at the heart of its effort 'to fashion a coherent labor policy' and which has been a predicate underlying action by this Court and the state courts. More importantly, it is to say that Congress limited unions in the powers necessary to the discharge of their role as exclusive statutory bargaining agents by impairing the usefulness of labor's cherished strike weapon." *Id.* at 183, 87 S. Ct. at 2008.

Of course, *Allis-Chalmers* did not mean that unions were free to impose discipline for any purpose at all. Section 8(b)(1) must be read so as to conform with the other provisions of federal labor law. *See, e.g.,* NLRB v. Int. Ladies Garment Wkrs Union, *supra,* 274 F.2d 376; Silard, Labor Board Reg-

ulation of Union Discipline After Allis-Chalmers, Marine Workers and Scofield, 38 Geo.Wash.L.Rev. 187, 193–196 (1969). Thus if a union rule "invades or frustrates an overriding policy of the labor laws the rule may not be enforced, even by fine or expulsion, without violating § 8(b)(1)." Scofield v. NLRB, 394 U.S. 423, 429, 89 S.Ct. 1154, 1158, 22 L.Ed.2d 385 (1969). *See* NLRB v. Industrial Union of Marine & Shipbuilding Wkrs, 391 U.S. 418, 88 S.Ct. 1717, 20 L. Ed.2d 706 (1968). But if one thing is clear after *Allis-Chalmers*, it is that there is no "overriding policy of the labor laws" which prohibits reasonable union fines levied against members who cross a lawful picket line to perform rank-and-file struck work. In fact, quite the contrary is true.

"Integral to [the] federal labor policy has been the power in the chosen union to protect against erosion its status under that policy through reasonable discipline of members who violate rules and regulations governing membership. That power is particularly vital when the members engage in strikes. The economic strike against the employer is the ultimate weapon in labor's arsenal for achieving agreement upon its terms, and '[t]he power to fine or expel strikebreakers is essential if the union is to be an effective bargaining agent. . . .' * * * *"

NLRB v. Allis-Chalmers Manufacturing Co., *supra,* 388 U.S. at 181, 87 S.Ct. at 2007. (Footnotes omitted.)

The Board attempted in its *Oakland Mailers* decision to distinguish *Allis-Chalmers* from cases arising under Section 8(b)(1)(B).

" * * * The Supreme Court, in finding lawful the union action involved in *Allis Chalmers*, relied in part on the proviso to Section 8(b)(1)(A), providing that the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership shall not be impaired. However, that proviso is

limited to Section 8(b)(1)(A) of the Act only and is not a part of Section 8(b)(1)(B). * * *"
San Francisco-Oakland Mailers' Union No. 18, *supra*, 172 NLRB No. 252 (slip opinion at 3–4). It is quite clear, however, that the Board has misread the *Allis-Chalmers* decision. The Court expressly stated in its opinion that it was unnecessary to decide whether the proviso protected the union discipline there under scrutiny. *See* NLRB v. Allis-Chalmers Manufacturing Co., *supra*, 388 U.S. at 192 n. 29, 87 S.Ct. 2001. And as Mr. Justice Black pointed out in dissent: "[T]he Court correctly assumes that the proviso to § 8(b)(1)(A) cannot be read to authorize its holding." *Id.* at 200, 87 S.Ct. at 2017. Indeed, our own court just recently characterized the holding in *Allis-Chalmers* as follows:

" * * * Instead of relying on the express language of the *proviso*, * * * the Supreme Court carefully analyzed the entire legislative history of Section 8(b)(1)(A), and it concluded that Congress did not intend to prohibit such internal union discipline by the prohibition against 'restraint' or 'coercion.' * * *"

Booster Lodge No. 405, Int. Assn of Machinists, etc. v. NLRB, 148 U.S.App.D.C. 119, 125, 459 F.2d 1143, 1149 (1972).

That the proviso is appended to Section 8(b)(1)(A) rather than to both that section and Section 8(b)(1)(B) is without significance in these cases. As we saw earlier, under the original congressional understanding Section 8(b)(1)(B) did not affect union discipline of supervisors, but only concerned direct attempts to restrain or coerce employers. So understood, it was unnecessary to repeat the proviso in Section 8(b)(1)(B). Now that *Oakland Mailers* has expanded Section 8(b)(1)(B) to encompass indirect coercion of employers through discipline of supervisors, the proviso gains significance for both subsections of Section 8(b)(1), for as the Supreme Court noted in *Allis-Chalmers*, the proviso was only part of "the repeated refrain throughout the debates on § 8(b)(1)(A) *and other sections* that Congress did not propose any limitations with respect to the internal affairs of unions * * *." 388 U.S. at 195, 87 S.Ct. at 2014. (Emphasis added.)

Apparently having sensed that its proviso distinction will not withstand analysis, the Board now puts forth a new argument. *Allis-Chalmers*, according to the Board, dealt only with internal union rules affecting the relationship between a member and the labor organization to which he belongs. Here, however, the Board claims, the union discipline does not concern legitimate internal union affairs, but affects primarily the employer who is external to the union-member relationship.[21]

The Board's internal-external distinction, however, simply cannot be squared with the holding in *Allis-Chalmers*. Of course, the discipline in *Allis-Chalmers* had, and was intended to have, an external effect on the employer. By deterring strikebreakers the rule assured union solidarity and thereby allowed the union to bring greater economic pressure on the company. The discipline has precisely the same "external" effect in

21. The Board argues that the union has only a peripheral interest in fining the supervisors because supervisors make up such a small percentage of the total work force. In each case, the Board argues, the union fined less than 60 supervisors, while approximately 12,000 other employees in *Illinois Bell* and approximately 5,000 other employees in *Florida Power* remained, in the Board's words, "available for strike action." It is obvious, however, that the union had a definite and substantial interest in preventing even a small number of supervisors from performing rank-and-file struck work, since in the highly automated public utility industries involved in these cases a small work force composed of strikebreakers and non-union management personnel can evidently provide sufficient manpower to continue vital services in a strike, thereby cutting into the strike's effectiveness.

the present cases. If the anti-strike-breaking activity there can be characterized as "internal" it simply makes no sense to label the same sort of anti-strikebreaking rule in these cases as "external." The Board recognized as much in its *Oakland Mailers* decision: "[O]nly legitimate internal union affairs are protected under *Allis-Chalmers*. The *Allis-Chalmers* case involved a union's fining of its members for crossing picket lines. The primary relationship there affected was the one between the union and its members, and the union's particular objective—solidarity in strike action—was deemed by the Supreme Court a legitimate area for union concern in the circumstances involved." San Francisco-Oakland Mailers' Union No. 18, *supra*, 172 NLRB No. 252 (slip opinion at 4). (Footnote omitted.)

■ It is true that *Allis-Chalmers* concerns only so-called "internal" union discipline in the sense that the term "internal" refers to the manner in which the union enforces its rule, not to the identity of the parties affected by the rule. Union discipline is internal when it is enforced through fines or expulsion from the union. It becomes "external," and a violation of Section 8(b)(1)(A) as well as other sections of the Act, when the union seeks to have the employer fire or take other measures against the recalcitrant union member.[22] The Supreme Court made this clear in its decision in Scofield v. NLRB, *supra*, its next major Section 8(b)(1) case after *Allis-Chalmers*. Describing its analysis in *Allis-Chalmers*, the *Scofield* Court stated:

"* * * The Court thus essentially accepted the position of the National Labor Relations Board dating from Minneapolis Star & Tribune Co., 109 N.L.R.B. 727 (1954) where the Board also distinguished internal from external enforcement in holding that a union could fine a member for his failure to take part in picketing during a strike but that the same rule could not be enforced by causing the employer to exclude him from the work force or by affecting his seniority * * *" 394 U.S. at 428, 89 S.Ct. at 1157. (Footnote omitted.) *See also* NLRB v. Allis-Chalmers Manufacturing Co., *supra*, 388 U.S. at 185, 87 S.Ct. 2001, 18 L.Ed.2d 1123; Local 283, United Auto., Aircraft & Agric. Imp. Wkrs (Wisconsin Motor Corp.), 145 NLRB 1097, 1104 (1964), affirmed, sub nom. Scofield v. NLRB, *supra*. The internal-external distinction thus has nothing to do with who is affected by the union discipline. As the Court recognized in *Scofield*, union discipline normally affects all three participants in the union-management relation: employer, employee, and union. Scofield v. NLRB, *supra*, 394 U.S. at 431, 89 S. Ct. 1154. But it does not follow from this that enforcement of the rule violates the Act "unless some impairment of a statutory labor policy can be shown." *Id.* at 432, 89 S.Ct. at 1159.

■ The Board's last attempt to distinguish *Allis-Chalmers* relates to the matter of statutory labor policy. Subsequent to *Allis-Chalmers*, the Court made it clear that even internal enforcement of union rules violates Section 8(b)(1)(A) if such enforcement "invades or frustrates an overriding policy of the labor laws," Scofield v. NLRB, *supra*, 394 U.S. at 429, 89 S.Ct. at 1158, or if it contravenes "other considerations of public policy * * *." NLRB v. Industrial Union of Marine & Shipbuilding Wkrs., *supra*, 391 U.S. at 424, 88 S.Ct. 1717. The Board argues, as we indicated at the close of Part I of this opinion, that the legislative history of Sections 2(3) and 14(a) of the Act indicates an overriding congressional policy in favor of supervisors who are completely subservient to their employer's

---

22. "[Sections 8(b)(1), 8(b)(2), 8(a)(1), 8(a)(2), and 8(a)(3)] * * * form a web, of which § 8(b)(1)(A) is only a strand, preventing the union from inducing the employer to use the emoluments of the job to enforce the union's rules." Scofield v. NLRB, 394 U.S. 423, 428–429, 89 S.Ct. 1154, 1157, 22 L.Ed.2d 385 (1969).

will. As indicated earlier, we disagree with the Board's analysis of the interrelationship between Section 8(b)(1)(B) on the one hand and Sections 2(3) and 14(a) on the other, and it is to this issue that we now turn.

### III

Although it is only since 1968 that the Board has sought to use Section 8(b)(1)(B) as a solution to conflict of loyalties problems arising from union discipline of supervisor-members, these problems are not of recent vintage.[23] Prior to passage of the National Labor Relations Act in 1935, it was quite common for foremen in many industries to become unionized in the same bargaining unit as their subordinates. · *See* Jones v. Laughlin Steel Corp., 66 NLRB 386, 400 (1946). Conflict of loyalties problems were common, and employers were concerned "lest foremen should be subject to union discipline for differing with the local union in the interpretation of the terms of a contract." *Id.* at 401 n.27, *quoting* H. Millis (ed.), How Collective Bargaining Works 67 (1942). Such problems as arose were apparently worked out through collective bargaining. Unions recognized the legitimate concerns of employers in having contracts fairly administered by foremen, and means were provided for resolving disputes. "The unions [did] not, however, forego their right to discipline foremen for disobeying laws relating to internal union matters, or for deliberately disregarding union rules." *Ibid.*

The problem of supervisor-member conflict of loyalties first came before the Board under the 1935 Act in the form of the question whether foremen and other supervisors were "employees" under the statute, that is, whether management was required to engage in collective bargaining with foremen. The Board first held that foremen were "employees" and entitled to the protections of the Act,

see Union Collieries Coal Co., 41 NLRB 961 (1942), but abruptly shifted course a year later in Maryland Drydock Co., 49 NLRB 733 (1943). The Board justified its shift on fears that conflicts of loyalties would arise if foremen belonged to the same union as the men under their supervision.

"The very nature of a foreman's duties make him an instrumentality of management in dealing with labor. The duty of supervision with which he is principally charged implies a delegation of authority with respect to the selection, promotion, and discharge of the workers in his section. * * * To hold that the National Labor Relations Act contemplated the representation of supervisory employees by the same organizations which might represent the subordinates would be to view the statute as repudiating the historic prohibition of the common law against fiduciaries serving conflicting interests."

*Id.* at 740. (Footnote omitted.) The Board, however, soon shifted positions again, holding that foremen were entitled to mandatory collective bargaining under the Act if they formed unions independent of those representing the rank and file. *See* Packard Motor Car Co., 61 NLRB 4 (1945), enforced, 6 Cir., 157 F.2d 80 (1946), affirmed, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947). And the next year, in Jones & Laughlin Steel Corp., *supra*, the Board held that supervisors were entitled to the protections of the Act even if they were represented by the same union that represented the rank and file.

The Board's opinion in Jones & Laughlin Steel Corp. is helpful in understanding the significance of the 1947 amendments to Sections 2(3) and 14(a) of the Act. To begin with, the Board recognized the conflict of loyalties problems arising from having supervisors belong to the same union that represents

---

23. *See, e. g.,* Local Union No. 57 v. Boyd, 245 Ala. 227, 16 So.2d 705 (1944), where a union fined a supervisor-member for firing another union member for loafing on the job.

the rank and file. The Board noted the "serious and genuine concern about the effect of this decision upon the relations of management with its foremen, and the effect of the unionization of the latter upon their loyalty to the employer's interests." 66 NLRB at 402. But the Board concluded that "satisfactory solutions" to these problems "can be worked out by men of good will on both sides in the give-and-take of collective bargaining." *Id.* at 401. "[T]he union and the employer, neither of which is lacking in ingenuity, should not be discouraged by this Board from working out, at the bargaining table, contract clauses which will deal with this difficult situation. Such clauses can guarantee the maintenance of discipline by supervisors without fear of reprisal by the rank-and-file * * * ." *Id.* at 402–403.

The question whether foremen and other supervisory employees were entitled as a class to the rights of self-organization, collective bargaining, and other concerted activities assured to employees by the 1935 National Labor Relations Act came before the Supreme Court in Packard Motor Car Co. v. NLRB, 330 U.S. 485, 67 S.Ct. 789, 91 L. Ed. 1040 (1947). The Court had before it the arguments "that unionization of foremen is from many points bad industrial policy, that it puts the union foreman in the position of serving two masters, divides his loyalty and makes generally for bad relations between management and labor." *Id.* at 493, 67 S.Ct. at 794. But the Court found policy to be irrelevant to its decision, and felt compelled to define the statutory term "employee" literally, thereby concluding that foremen and other supervisors were entitled to the Act's protections.

Congress picked up the Court's cue when it enacted the 1947 amendments to the Act. As a matter of policy, the Congress felt that employers should not be forced into having unionized supervisors.

"The evidence before the committee shows clearly that unionizing supervisors under the Labor Act is inconsistent with * * * our policy to protect the rights of employers; they, as well as workers, are entitled to loyal representatives in the plants, but when the foremen unionize, even in a union that claims to be 'independent' of the union of the rank and file, they are subject to influence and control by the rank and file union, and, instead of their bossing the rank and file, the rank and file bosses them."

1 Legis.Hist. 305. The legislative history of Sections 14(a) and 2(3) clearly indicates that the purpose of these provisions was to reverse the result of the *Packard* case so that no employer would be required under the Act to bargain collectively with his foremen or to hire foremen who were union members.

"What the bill does is to say * * * [t]hat no one, whether employer or employee, need have as his agent one who is obligated to those on the other side, or one whom, for *any* reason, he does not trust."

I Legis.Hist. 308. (Emphasis in original.) *See also* Int. Ladies Garment Wkrs Union v. NLRB, 2 Cir., 339 F.2d 116, 122 (1964). In the words of the Senate Report:

"It merely relieves employers who are subject to the national act free from any compulsion by this National Board or any local agency to accord to the front line of management the anomalous status of employees."

1 Legis.Hist. 411.

While Section 14(a) provides that "no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining," it also expressly provides that "[n]othing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization * * *." The purpose of this provision is also clear from the legislative history.

"The bill does not forbid anyone to organize. It does not forbid any employer to recognize a union of foremen. Employers who, in the past, have bargained collectively with supervisors may continue to do so. * * * *"

1 Legis.Hist. 308.

" * * * It should be noted that all that the bill does is to leave foremen in the same position in which they were until the Labor Board reversed the position it had originally taken in 1943 in the *Maryland Drydock case* * * *. In other words, the bill does not prevent anyone from organizing nor does it prohibit any employer from recognizing a union of foremen. * * * "

1 Legis.Hist. 411.

The legislative history of Section 14(a) is important in two respects. First, it is clear the the supervisory exclusion was enacted precisely because Congress assumed that when supervisors became union members they were "obligated to those on the other side" and were "subject to the influence and control of the rank and file union." And Congress solved the conflict of loyalties problem by giving management the right to make the would-be supervisor choose between union loyalty and rank-and-file status on the one hand and management loyalty and supervisory status on the other.

Second, by expressly providing that foremen could unionize, and by indicating that employers who so desired could continue to bargain collectively with supervisors, Congress effectively gave employers an option. Those who wished to do so could continue to hire union members as supervisors and could continue to engage in collective bargaining with supervisors, resolving whatever conflict of loyalties problems arose through the traditional give-and-take of collective bargaining approved in Jones & Laughlin Steel Corp., *supra*, to arrive at contract clauses dealing with the problem. *See* pages 1163, 1164 *supra.* On the oth-

er hand, those employers who wanted to settle the conflict of loyalties problem once and for all would be within their rights in refusing to hire union members as supervisors and refusing to engage in collective bargaining with supervisors.

This option approach to an employer's rights under Section 14(a) has received the tacit approval of the courts. For example, a union commits no unfair or unlawful act in proposing that supervisors be covered by the collective bargaining agreement, Sakrete of Northern California, Inc. v. NLRB, 9 Cir., 332 F.2d 902, 908 (1964), cert. denied, 379 U.S. 961, 85 S.Ct. 649, 13 L. Ed.2d 556 (1965), but a union does commit an unfair labor practice in trying to coerce an employer into agreeing to hire only union members as foremen. *See* Int. Typographical Union Local 38 v. NLRB, 1 Cir., 278 F.2d 6 (1960), affirmed by equally divided Court, 365 U. S. 705, 707, 81 S.Ct. 855, 6 L.Ed.2d 36 (1961). An employer is within his rights in refusing to engage in collective bargaining over supervisors, *cf.* Safeway Stores, Inc. v. Retail Clerks Int. Assn, 41 Cal.2d 567, 261 P.2d 721 (1953), and supervisors are routinely excluded from a certified bargaining unit at the employer's request. *See, e. g.,* Federal Compress & Warehouse Co. v. NLRB, 6 Cir., 398 F.2d 631 (1968); NLRB v. Corral Sportswear Co., 10 Cir., 383 F.2d 961 (1967). On the other hand, courts have approved contracts in which management agreed to hire only union members as foremen and where the conflict of loyalties problem was resolved by clauses in the collective bargaining agreement limiting the union's right to discipline supervisor-members. *See, e. g.,* NLRB v. News Syndicate Co., 2 Cir., 279 F.2d 323 (1960), affirmed, 365 U.S. 695, 81 S.Ct. 849, 6 L.Ed.2d 29 (1961). *Cf.* Evening Star Newspaper Co. v. Columbia Typographical Union No. 101, D. D.C., 141 F.Supp. 374 (1955), affirmed, 98 U.S.App.D.C. 206, 233 F.2d 697 (1956).

In applying this option approach, it has always been assumed, consistent

with the legislative history, *see* pages 1164, 1165 *supra*, that once an employer permits his supervisors to join unions or agrees to engage in collective bargaining with unionized supervisors, he no longer can claim their undivided loyalty in every employer-union dispute except to the extent that the collective bargaining agreement ensures such loyalty. *See, e. g.,* NLRB v. News Syndicate Co., *supra*, 279 F.2d at 330:

> " \* \* \*. The foremen, under the contract at least, were not subject to the conflicting obligations of two masters. *Regardless of the Union obligations to which, without more, a foreman would be subject by reason of his Union membership,* \* \* \* the contract specifically provides that: 'The Union shall not discipline the foreman for carrying out the instructions of the publisher or his representative in accordance with this agreement.' \* \* \* By these provisions the parties clearly indicated that the foremen are *solely* [this emphasis in original] the employers' agents and that they are under an obligation to act in accordance with the agreement, *in spite of Union ties and obligations which otherwise might control.* \* \* \* "

(Emphasis added; footnote omitted.) *See also* NLRB v. News Syndicate Co., 365 U.S. 695, 701, 81 S.Ct. 849, 6 L.Ed. 2d 29 (1961); Int. Typographical Union

Local 38 v. NLRB, *supra*, 278 F.2d at 12. *Cf.* Local Union No. 1055 v. Gulf Power Co., N.D.Fla., 175 F.Supp. 315 (1959); Safeway Stores, Inc. v. Retail Clerks Int. Assn., *supra*.[24] And, until now, it seemed that the Board shared this assumption. To justify its holding that certain supervisors could actively participate in union affairs, the Board recognized that supervisor-members "owe allegiance at least as much to the Union as to their employers. They are agents of both." Nassau and Suffolk Contractors' Assn, Inc., 118 NLRB 174, 182 (1957).

Thus, while now purporting to interpret Section 8(b)(1)(B) so as to enforce the underlying policy of Section 14(a) in favor of management's right to loyal supervisors, the Board in fact acts contrary to the very assumption engendering enactment of Section 14(a), namely, that when a supervisor joins a union he is under certain obligations to the union which conflict with his loyalty to his employer.

 Throughout the lengthy discussion of supervisor-union member conflict of loyalties in the legislative history of the 1947 amendments, there is not a single indication that Section 8(b)(1)(B) was in any way related to the comprehensive solution to the conflict of loyalties problem found in Sections 2(3) and 14(a).[25] Section 8(b)(1)(B) was in-

---

24. Prior to enactment of the 1947 amendments, the Retail Clerks International Association represented store managers for collective bargaining purposes, and these managers were covered by collective bargaining agreements. In 1949, after passage of the amendments, new contract negotiations came up and Safeway announced its intention not to bargain with respect to managers any more and not to recognize the union as their representative. The union struck over this point, the trial court enjoined the strike, and the California Supreme Court affirmed:

> " \* \* \* As members of the defendant unions [store managers] would under union rules be in duty bound to advance the cause of the community of interest of store managers and clerks in any dispute or disagreement with

their principal. They would be under constant apprehension of the penalties under union rules, such as fines, suspension, or expulsion. It is eminently proper that management supervisors, the store managers in this case, be kept free from the divided loyalty that would be engendered by compulsory membership in the defendant local unions. \* \* \* "

41 Cal.2d at 575, 261 P.2d at 726.

25. That the supervisory exclusion in §§ 2(3) and 14(a) is unrelated to the § 8(b)(1)(B) unfair labor practice provision is further confirmed by the legislative history. Sections 2(3) and 14(a) of the 1947 amendments had their forerunners in the Case bill passed by both houses of Congress in 1946 but vetoed by President

tended to deal with a problem separate and distinct from the problem of supervisor-union member conflict of loyalties, as is evident from the different scopes of the Section 2(3) supervisor exclusion and Section 8(b)(1)(B). The supervisor exclusion in Section 2(3), defined in Section 2(11), applies not only to individuals having authority to "adjust [employee] grievances," but also to any individual "having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees * * *." The scope of Section 8(b)(1)(B), in contrast, is much narrower, and concerns only those individuals who represent the employer "for the purposes of collective bargaining or the adjustment of grievances." Since the scope of Section 8(b)(1)(B) is narrower than that of the supervisor exclusion in Section 2(3), the Board's approach achieves the anomalous result of having certain supervisor-members—those coming within the definitions of both Sections 2(3) and 8(b)(1)(B)—immune from all union discipline where there is a dispute between the union and the employer, while other supervisor-members—those coming within the definition of Section 2(3) but falling outside the definition of Section 8(b)(1)(B)—remain subject to union discipline. Such a dichotomy is awkward on its face, and makes no sense if one accepts the Board's assumption that under Section 14(a) a supervisor owes his undivided loyalty to his employer not only where his employer exercises his right to refuse to hire union members as supervisors, but also where the employer permits supervisors to join unions.

Not only is there no indication of any legislative purpose to make Section 8(b)(1)(B) an integral part of the solution to supervisor-union member conflict of loyalties problems, but the result achieved by the Board's interpretation of Section 8(b)(1)(B) is clearly inconsistent with the concept of union membership as understood by Congress. The " 'contractual conception of the relation between a member and his union widely prevails in this country . . .' " NLRB v. Allis-Chalmers Manufacturing Co., *supra*, 388 U.S. at 182, 87 S.Ct. at 2008, *quoting* Int. Assn of Machinists v. Gonzales, 356 U.S. 617, 618, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958).

"The rationale of the contract theory is that a member, by joining the union, enters into a contract, the terms of which are expressed in the union constitution and by-laws. The member consents to suspension or expulsion according to the provisions of that contract * * *. * * * *"

Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049, 1054 (1951).[26] The Board's immunity from

Truman. *See* H.R. 4908, 79th Cong., 2d Sess. (Jan. 14, 1946). Section 9(a) of the Case bill, just like the 1947 amendments, amended § 2(3) of the Act by adding supervisors as a class of individuals excluded from the statutory definition of "employees." Section 9(c) of the bill, just like amended § 14(a) in 1947, provided that "[n]othing herein shall prohibit a supervisory employee from becoming or remaining a member of a labor organization." The legislative history of the 1947 amendments clearly shows that §§ 2(3) and 14(a) in the 1947 amendments merely sought to reenact the provisions of the Case bill, the only difference being a minor one in the definition of supervisors. *Compare* 1 Legis.Hist. 308 *with* S.Rep.No.1177, 79th Cong., 2d Sess., at 9–10, 17–19 (1946). *Compare* § 2(11) of the Act, 29 U.S.C. § 152(11), *with* § 9(b) of the Case bill, H.R. 4908, *supra*. What is significant for present purposes is that the Case bill, while containing virtually identical forerunners of §§ 2(3) and 14(a), did not contain any provision even remotely similar to § 8(b)(1)(B).

26. Compare this conception of union membership with that of counsel for the charging party in *Illinois Bell*, who characterized the union's oath of allegiance required of new members as "mumbo jumbo in the union hall * * *." Transcript of hearing at 392. As to counsel's suggestion that the union security clause forced employees to take an oath of allegiance to the union, *see* Local Union No. 749, Int. Brhd of Boilermakers, etc. v.

union discipline for strikebreaking supervisors makes a shambles of the mutuality of obligation implicit in the contract approach to union membership. "Strikebreaking is uniformly considered sufficient reason for expulsion * * * for it undercuts the union's principal weapon and defeats the economic objective for which the union exists." NLRB v. Allis-Chalmers Manufacturing Co., *supra*, 388 U.S. at 181–182 n.8, 87 S.Ct. at 2007, *quoting* Summers, Disciplinary Powers of Unions, 3 Ind. & Lab.Rel. Rev. 483, 495 (1950).

In addition, the Board's interpretation of Section 8(b)(1)(B) reaches a result inconsistent with ordinary standards of equity and fairness. In *Illinois Bell,* for example, the employer recognized the union as the exclusive bargaining agent for some of its supervisory personnel. These supervisors directly benefit from union membership, not just from the fringe benefits available to all union members, but from the contract which the union negotiates with management. True, the present contract does not determine their wages, but these employees do benefit from other contract provisions such as that establishing vacation rights. These supervisors might benefit from a successful strike, for example, if the purpose or result of the strike was to obtain longer vacations or to improve some other condition of employment applicable to all members of the bargaining unit, supervisory or rank and file. Can it fairly be said that Congress intended that supervisor-members can perform rank-and-file struck work, undercutting a strike from which they serve to benefit, and remain immune from union discipline while all other members of the bargaining unit remain bound by the majority decision of the union to go out on strike?

The inequity in the Board's approach to Section 8(b)(1)(B) may well have been tacitly conceded by both the Board and the employer in *Florida Power* when, by stipulation, it was agreed that no unfair labor practice charge would be based on union discipline of those supervisors who were members of the bargaining unit and who had their wages and conditions of employment determined by the collective bargaining agreement. *See* note 8 *supra.* Were the Board to have applied Section 8(b)(1)(B) to union discipline of these supervisor-members, the Board would have prevented the union from disciplining strikebreaking supervisors whose very wages were the subject of the ongoing strike. We note, however, that nothing in the Board's approach would limit Section 8(b)(1)(B) so that it would not apply to union discipline of these supervisors. The Board's position is that a union cannot fine supervisor-members for "furthering the interests of the Employer in a dispute not between the Union and the supervisor-union members but between the Employer and the Union." Local Union No. 2150, Int. Brhd of Electrical Wkrs, *supra,* 192 NLRB No. 16 (slip opinion at 6). Under such an approach it is irrelevant whether or not the supervisors are members of the collective bargaining unit and whether or not their wages and conditions of employment are negotiated for them by the union. That the Board places no significance on the fact that supervisors are members of the collective bargaining unit represented exclusively by the union is demonstrated in *Illinois Bell* where the Board based its finding of a Section 8(b)(1)(B) viola-

---

NLRB, 151 U.S.App.D.C. 172, 466 F.2d 343 (1972), cert. denied, 410 U.S. 926, 93 S.Ct. 1356, 35 L.Ed.2d 586 (1973), which held that a union may not lawfully request an employer with whom it has a union security agreement to fire an employee who, although willing to pay the requisite union dues and fees, refuses to assume formal union member-

ship by signing the union's membership application card. *See also* NLRB v. General Motors Corp., 373 U.S. 734, 742, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963) ; Union Starch & Refining Co. v. NLRB, 7 Cir., 186 F.2d 1008, cert. denied, 342 U.S. 815, 72 S.Ct. 30, 96 L.Ed. 617 (1951). *Cf.* note 27 *infra.*

tion on discipline of supervisor-members both outside and within the collective bargaining unit. *See* pages 1150, 1151 *supra*.

Those supervisor-union members who feel that the union is not adequately representing their interests, or who feel that they do not wish to be bound to support the union in its economic disputes with management, are free at any time to resign from union membership. As the Supreme Court recently made clear, once they do so, and once they voluntarily agree to relinquish the benefits of union membership, they are no longer subject to union discipline. *See* NLRB v. Granite State Joint Board, *supra; id.* at 218, 93 S.Ct. 385, 34 L.Ed.2d 422 (Mr. Chief Justice Burger, concurring).[27] But it is unreasonable for supervisors to expect to be able to enjoy either the fringe or the direct benefits of union membership without bearing the obligation of supporting the union in its economic disputes with the employer.[28] *See* NLRB v. San Francisco Typographical Union No. 21, 9 Cir., 486 F.2d 1347, 1350 (1973).

The lack of equity and fairness in the Board's approach is also evident when we look at the situation from the employer's perspective. Section 14(a) gives the employer a means to obtain the undivided loyalty of his supervisors. If the employer, however, chooses not to exercise his rights under that section, permits his supervisors to join unions and agrees to engage in collective bargaining with the union over supervisors, the employer cannot still insist on the supervisors' undivided loyalty in every union-employer dispute, no matter how unrelated the subject of that dispute is to the supervisory function. The employer, of course, benefits from having supervisors continue membership in unions. He can follow the commendable practice of elevating supervisors from the rank and file, without having to compensate these supervisors for any loss in pension or death benefit rights they would incur were the employer to exercise his Section 14(a) rights and force them to resign from union membership upon achieving supervisory status.[29] Management cannot have its cake and eat it too. As Professor Gould has pointed out:

" * * * [S]upervisors who remain union members are most often obtaining additional benefits. Frequently, they have remained members in order to retain possession of withdrawal cards which will make it less expensive for them to re-enter the trade or another plant under union jurisdiction. Under the *Allis-Chalmers* rationale, this would seem to indicate

27. Nor is it significant that the collective bargaining agreement in *Illinois Bell* contains a union security clause. That clause, like the union security clause in *Granite State Joint Board*, requires as a condition of employment that members of the bargaining unit remain union members in good standing, but provides that an employee shall be deemed to be a member in good standing "so long as he pays or tenders to the Union an amount equal to the regularly recurring monthly Union dues * * *." We intimate no views concerning a union's power to discipline members where a security clause in the collective bargaining agreement purports to require active union membership as a condition of employment. *See also* Local Union No. 749, Int. Brhd of Boilermakers, etc. v. NLRB, *supra* note 26, 151 U.S.App.D.C. at 174 n. 3, 466 F.2d at 345 n. 3.

28. "I question that Congress intended by Section 8(b)(1)(B) to compel unions to retain representatives of management on their membership rolls. It appears to me that individuals who aspire to be representatives of management and to receive the perquisites of management must be prepared to relinquish the benefits afforded by union membership. If they elect to eat the icing, they should eat the cake; if they choose union membership, they choose to abide by its constitution." Local Union No. 2150, Int. Brhd of Electrical Wkrs, 192 NLRB No. 16 (trial examiner's decision at 6) (1971).

29. This was apparently what motivated Illinois Bell to permit District Superintendents to remain union members. *See* text at pp. 1150, 1151 *supra*.

a pledge of allegiance by the supervisor and therefore should be deemed consent by such an individual to render himself liable to financial obligations where the union's interest is direct and where the conduct engaged in is somewhat distant from basic supervisory functions. If the employer is unduly harmed by such a rule, it seems to me that its obligation is to make the supervisory position financially attractive enough for the supervisor to forego the benefits of union membership and to resign."

Gould, Some Limitations Upon Union Discipline Under the National Labor Relations Act: The Radiations of Allis-Chalmers, 1970 Duke L.J. 1067, 1129.

 This is not to say, of course, that by permitting his supervisors to join unions the employer completely waives his right to their loyalty. Even if he permits them to join unions, Section 8(b)(1)(B), as interpreted by *Oakland Mailers* and *Meat Cutters*, immunizes them from union discipline imposed for the manner in which they perform their supervisory functions. In addition, the employer is free to seek further immunity from discipline through the collective bargaining process. For example, if the employer shares the Board's fear that when supervisors are forced not to perform rank-and-file struck work they become biased against the employer in the later performance of their supervisory functions, the employer may condition his permission for supervisors to remain union members upon the union's agreeing to a bargaining contract clause that immunizes supervisors from union discipline for performing rank-and-file struck work. As we have already seen, such an agreement by which the employer permits supervisors to join unions upon condition that the union give up part of its control over the supervisors is a mode of dealing with the problem of supervisor conflicts of loyalty that, in contrast to the Board's approach, has a firm basis in history both before and after passage of the 1947 amendments. Not only is it historically sound, but it comports with the Act's pervasive focus on collective bargaining as the means for resolving labor-management conflicts. *See* Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893 (1937). Where the employer has bargained for immunity from union discipline for his supervisors, such a clause may be enforced through the normal grievance adjustment procedure or arbitration machinery established in the contract to resolve alleged contract violations.[30] But where the employer has agreed to union membership for his supervisors without obtaining in return some concession from the union with respect to the immunity of supervisors from discipline, interpreting Section 8(b)(1)(B) so as to make the supervisor subject to an undivided loyalty to his employer in all union-employer disputes permits the employer to abrogate its part of the bargain. We can "discern no basis in the statutory policy encouraging collective bargaining for giving the employer a better bargain than he has been able to strike at the bargaining table." Scofield v. NLRB, *supra*, 394 U.S. at 443, 89 S.Ct. at 1159, 22 L.Ed.2d 385.

 To be sure, the Labor Board is entitled to great deference when it interprets the act it administers. *See, e. g.,* Brooks v. NLRB, 348 U.S. 96, 75 S. Ct. 176, 99 L.Ed. 125 (1954); Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). But this deference has its limits. In the final analysis, "administrative experience is of weight in judicial review only to this point—it is a persuasive reason for deference to the [Board] in the ex-

---

30. Accordingly, we need not decide in these cases whether in disciplining supervisors the unions violated provisions of the collective bargaining agreement (or the Letter of Understanding in *Illinois Bell*) which might be read to restrict the union's right to discipline supervisors. *See* text at pp. 1149 & 1150 *supra*.

ercise of its discretionary powers under and within the law. It cannot be invoked to support action outside of the law. And what action is, and what is not, within the law must be determined by courts, when authorized to review, no matter how much deference is due to the agency's fact finding. Surely an administrative agency is not a law unto itself * * *." SEC v. Chenery Corp., 332 U.S. 194, 215, 67 S.Ct. 1760, 1762, 91 L. Ed. 1995 (1947) (Mr. Justice Jackson, dissenting).

Where, as here, the Board's interpretation of the statute cannot be derived from the statutory language or from prior Board precedent, and where that interpretation conflicts with Supreme Court precedent, with the legislative history, and with basic principles of fairness, the Board acts outside the law. Section 8(b)(1)(B) cannot reasonably be read to prohibit discipline of union members—supervisors though they be—for performance of rank-and-file struck work.

Reversed and remanded.

LEVENTHAL, Circuit Judge, with whom Circuit Judge McGOWAN joins, concurring:

I concur in the opinion for the court authored by Judge Wright, which includes what I think are the salient points of this case. My separate word is not in derogation of that opinion but is added, first, to note that the same result obtains even if there should be disagreement with some aspects of the court's opinion, and second because I think the soundness of our result is underscored by thinking of this case in a large context of Congressional policy on upward mobility of labor.

Congress did not accept the view that supervisors, such as foremen, are necessarily and for all purposes to be identified as completely integrated in management. Foremen are officers of management, but of a special kind; like noncommissioned sergeants, they bear a special relationship to the employee troops, one that promotes two-way communication and working relationships, and is of unique value to the entire enterprise.

There would be no problem if Congress had accepted a clear-cut view of foremen, as wholly integrated with management. This they could have done, by excluding foremen from employees' unions, or removing them from any union discipline, a course that was counseled in the name of good sense.[1] But as in so many other aspects of labor-management legislation, Congress was more interested in an accommodation of tensions than the tidiness of abrupt solutions.[2]

1. *See* Statement of Senator Ball, II Legislative History of the Labor Management Relations Act, 1947 (N.L.R.B.1948) at 1524, quoted in Meat Cutters Union Local 81 v. N.L.R.B., 147 U.S.App.D.C. 375, 381 n. 16, 458 F.2d 794, 800 n. 16 (1972).

2. In Carpenters' Union v. Labor Board, 357 U.S. 93, 99–100, 78 S.Ct. 1011, 1016, 2 L.Ed.2d 1186, Mr. Justice Frankfurter described the compromises inherent in the Taft-Hartley Act, and the judicial path to observing them, as follows:

It is relevant to recall that the Taft-Hartley Act was, to a marked degree, the result of conflict and compromise between strong contending forces and deeply held views on the role of organized labor in the free economic life of the Nation and the appropriate balance to be struck between the uncontrolled power of management and labor to further their respective interests. This is relevant in that it counsels wariness in finding by construc-

tion a broad policy against secondary boycotts as such when, from the words of the statute itself, it is clear that those interested in just such a condemnation were unable to secure its embodiment in enacted law. The problem raised by these cases affords a striking illustration of the importance of the truism that it is the business of Congress to declare policy and not this Court's. The judicial function is confined to applying what Congress has enacted after ascertaining what it is that Congress has enacted. But such ascertainment, that is, construing legislation, is nothing like a mechanical endeavor. It could not be accomplished by the subtlest of modern "brain" machines. Because of the infirmities of language and the limited scope of science in legislative drafting, inevitably there enters into the construction of statutes the play of judicial judgment within the limits of the relevant legislative materials.

One thing Congress did do was to give a complete option to any employer who placed paramount value on complete and unquestioned loyalty in the foreman. That employer has the absolute and unqualified right to insist that no foreman or supervisor be a member of an employee's union. § 14(a), 29 U.S.C. § 164(a) (1970).

Such an employer attitude, however, involves costs to the employer who appreciates the benefits to the enterprise from the upward mobility of labor. Not a few enlightened managements are on the lookout for talent in the ranks, able to infuse. management levels with the special awareness, aptitudes and attitudes of production experience.

Mobility of union labor is restricted if departure from the union means surrender of existing or prospective economic benefits. Such surrender requirements are not a rarity in the various benefit and insurance plans sponsored by labor unions. Congress might conceivably have required that such plans be revised so as to "vest" economic benefits on reasonable terms. But it has not yet even required vesting in the more glaring case of employer pension plans, which often remove pension rights on transfers to other employers, thus limiting mobility of labor.[3]

The option given by Congress is an accommodation to employers, enabling them to permit their supervisors to stay on as members of an employers' union, without surrender of the economic benefits available to members of the union.

The foremen who are permitted by their employers to maintain membership in the ranks of both union and management will have dual ties, and there is the prospect of clash and tension. That tension may not be entirely felicitous so far as management is concerned, but when elected by the employer it reflects a trade-off, making it preferable to available alternatives.

The employer is protected by the statute against the coercion implicit in certain union exercise of control over members. The clear language of the statute protects supervisors against discipline as union members, and means the control of the union must give way, when there is a question of union control over the choice of a supervisor,[4] or interference with the performance of the supervisor in "adjusting grievances."[5]

Whether or to what extent this approach may be extended to limit union control over members in other respects, it cannot be extended to the cases before us, which lie at the opposite end of the spectrum. A union member who performs rank-and-file struck work executes an act which is inherently destructive of the existence of the union. In contemplating that supervisors might continue as members of the union, Congress did not contemplate that the unions would have to surrender the elemental right of self-preservation, and to continue the good standing of agents of its own destruction.[6]

3. Roark v. Boyle, 141 U.S.App.D.C. 390, 397–398, 439 F.2d 497, 504–505 (1970).

4. *See* cases cited in .the majority opinion at p. 1153.

5. San Francisco-Oakland Mailers' Union No. 18, 172 NLRB No. 252 (1968).

6. *See* Allis Chalmers, 388 U.S. 175, 181–182, 87 S.Ct. 2001, 2007, 18 L.Ed.2d 1123 (1967), where the Court observed that " '[t]he power to fine or expel strikebreakers is essential if the union is to be an effective bargaining agent. . . .' ", *citing* Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049 (1951). It then noted that "Provisions in union constitutions and bylaws for fines and expulsion of recalcitrants, including strikebreakers, are therefore commonplace and were commonplace at the time of the Taft-Hartley amendments."

Similarly, the 1947 Taft-Hartley Act language including the ban on secondary boycotts was not applied literally, but was held to be subject to an implied exception excluding from the ban the traditional weapon of primary picketing. NLRB v. International Rice Milling Co., 341 U.S. 665, 670–671, 71 S.Ct. 961, 95 L.Ed. 1277 (1951). This approach was confirmed in

This case does not involve a management instruction to a foreman to perform managerial or supervisory work. Indeed Illinois Bell did not issue any instruction relative to the supervisors to work during the strike. If the management wishes to take the position that even rank-and-file work is the duty of a supervisor during a strike, then that is such an incursion on a union's elemental right of self-preservation as to require management to prohibit the supervisor from remaining with the union. A management insisting on absolute loyalty, to such an extent, must bear the potential expense of the economic rights supervisors will surrender by withdrawing from the union.

I do not take *Meat Cutters, supra* note 1, to be in conflict with this view. That case involved the implementation by a manager of a Safeway store of a company directive to teminate the grinding and slicing of certain meats at the retail stores, and to henceforth fill market needs by ordering meat in prepared form from a warehouse. While the implementation of this management decision had the effect of eliminating some work for the Union Local 81,[7] it was not inherently destructive of the Union. Without reconsidering the broad sweep of the doctrines of "indirect" interference and management loyalty voiced in *Meat Cutters,* they must be taken in the light of the factual problem then before the court, and cannot soundly be extended so as to prohibit union discipline of supervisors who perform rank-and-file struck work.

The limits on the protection for management loyalty are clearly posed by these cases, and reflect, I believe, an underlying congressional policy on the question of upward mobility in the labor market. Congress permits the employer to permit a rank-and-file worker to upgrade his employment situation by becoming a supervisor without surrendering certain rights as a member of an employees union. When, however, the transition is complete, and the supervisor is to side with management over the very existence of the union, the supervisor and management must make a choice and assume the consequences.

MacKINNON, Circuit Judge, with whom TAMM, ROBB and WILKEY, Circuit Judges, join, dissenting:

The majority expresses its approval of the Board's interpretation of section 8(b)(1)(B)[1] as set out in *Oakland Mailers* and its progeny. In *Oakland Mailers* the Board held illegal union actions which "were designed to change the (employer's) representatives from persons representing the viewpoint of management to persons responsive or subservient to (the union's) will."[2] In reaching the conclusion that the union's imposition of discipline on supervisors because of the manner in which they interpreted and applied the collective bargaining agreement violated section 8(b)(1)(B), the Labor Board noted:

> In enacting Section 8(b)(1)(B) Congress sought to prevent the very evil involved herein—union interference with an employer's control over its own representatives. *That [the union] may have sought the substitution of attitudes rather than persons, and may have exerted its pressure upon the [employer] by indirect rather than direct means, cannot alter the ultimate fact that pressure was exerted here for the purpose of interfering*

the 1959 amendments. Grain Elevator, Flour & Feed Mill Workers v. NLRB, 126 U.S.App.D.C. 219, 223–224, 376 F.2d 774, 778–779 (1967).

7. 147 U.S.App.D.C. at 378 n. 7, 458 F.2d at 797 n. 7.

1. 29 U.S.C. § 158(b)(1)(B) (1970) provides:

. It shall be an unfair labor practice for a labor organization or its agents—
 (1) to restrain or coerce * * *
 (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances.

2. San Francisco-Oakland Mailers' Union No. 18, 172 NLRB 2173 (1968).

*with the [employer's] control over its representatives. Realistically, the Employer would have to replace its foremen or face de facto nonrepresentation by them.*[3]

Thus, there is unanimous agreement on this court that section 8(b)(1)(B) prohibits union discipline of supervisory personnel for acts performed by them in the course of their supervisory or managerial duties. However, there is considerable disagreement as to whether a supervisor's performance of rank-and-file work during a strike at the direction of his employer constitutes part of his supervisory or managerial duties protected by section 8(b)(1)(B). Basically the majority's position is that the Board has stretched section 8(b)(1)(B) to the breaking point, in light of the legislative history of that section and sections 2(3)[4] and 14(a),[5] and the *Allis-Chalmers*[6] case, when it has sought to prohibit the union discipline of these supervisors. I find many defects in the majority's analysis, and shall deal with the pertinent statutes and legislative history first, and take up the *Allis-Chalmers* case lastly.

## I.

Underlying much of the majority's criticism of the Board's decision is the belief that a strike is "totally unrelated" to the collective bargaining process. Thus, the majority argues that even if the union's discipline here has the effect of making a supervisor pro-union during the strike, it "does not follow that this change in attitude will affect his performance of his collective bargaining or grievance adjustment functions." This is because, it is argued, when a supervisor performs rank-and-file work during a strike at the direction of his employer "he is no longer acting as a management representative." Whereas, when a supervisor performs his normal supervisory work, engages in collective bargaining, or adjustment of grievances, he is clearly acting as a management representative. Since, in the majority's view, performing struck work during a strike at the request of management is "unrelated" to the performance of his supervisory function, a supervisor will never be forced into the situation of having to serve two masters, as the Board found would be the case—for he "will be serving them at different times."

The majority's reasoning ignores the realities of the collective bargaining process. A strike is *not* "totally unrelated" to the supervisor's performance of collective bargaining functions. As the Board argued before this court, "the outcome of an economic strike . . . determines the substance of an agree-

3. *Id.* (emphasis added). *See* New Mexico District Council of Carpenters, 177 NLRB 500 (1969), enfd., 454 F.2d 1116 (10th Cir. 1972).

4. 29 U.S.C. § 152(3) (1970) provides:
 (3) The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined.

5. 29 U.S.C. § 164(a) (1970) provides:
 (a) Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining.

6. N.L.R.B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967)

ment between the disputing parties and is thus a far more fundamental dispute, and one with more at stake, than a quarrel over the interpretation of a portion of a previously negotiated agreement or over its application to a given situation or individual." [7] It is well recognized that "the use of economic pressure by the parties to a labor dispute is not a grudging exception to some policy of completely academic discussion enjoined by the Act; *it is part and parcel of the process of collective bargaining.*" N. L. R. B. v. Insurance Agents International Union, 361 U.S. 477, 495, 80 S.Ct. 419, 430, 4 L.Ed.2d 454 (1960) (emphasis added). It is readily apparent, therefore, that when supervisors' actions during an economic strike further the interests of their employer, they are performing in a manner which could reasonably be expected from such persons. *See* Local Union No. 2150, I. B. E. W., 192 NLRB No. 16 (1971). *See also,* Texas Co. v. N. L. R. B., 198 F.2d 540 (9th Cir. 1952). As management representatives, supervisory personnel may be requested by management to enhance the bargaining position of their employer during a dispute between it and the particular union involved.[8] Yet this is the precise activity for which the supervisors in question were disciplined by these unions.

Not only has the majority taken an unrealistic look at the role of a strike in the collective bargaining process, it completely disregards the Labor Board's assessment of what will be the realistic consequences of union discipline of supervisors during confrontations between the union and the employer. In both these cases the Board relied on its analysis of the same issue in *Local Union No. 2150, I. B. E. W.,* decided the same day as *Illinois Bell Telephone,* wherein the Board found that

> [t]he Union's fining of the supervisors who were acting in the Employer's interest in performing the struck work severely jeopardized the relationship between the Employer and its supervisors. Thus, *the fines,* if found to be lawful, *would now permit the Union to drive a wedge between a supervisor and the Employer, thus interfering with the performance of the duties the Employer has a right to expect the supervisor to perform.* The Employer could no longer count on the complete and undivided loyalty of those it has selected to act as its collective bargaining agents or to act for it in adjusting grievances. Moreover, such fines clearly interfere with the employer's control over its representatives.[9]

The Labor Board has drawn an inference from the evidence before it, concluding that the unions' discipline of these supervisors will interfere with the performance of their supervisory duties. Such inferences are not to be disturbed by a reviewing court merely because in its own opinion it disagrees with the rightness of the Board's judgment. Radio Officers' Union v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455, 48–50 (1954); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 490, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N. L. R. B. v. Nevada Consolidated Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305 (1942). Rather, as with other findings

---

7. Brief for the National Labor Relations Board at 15–16.

8. There is no question that supervisors enhance the bargaining position of their employer when they perform rank-and-file work during a strike, since their actions reduce the severity of the economic pressure borne by their employer as a result of the work stoppage.

9. Local Union No. 2150, I.B.E.W., 192 NLRB No. 16, slip op. at 6–7 (1971)

(emphasis added). *See* New Mexico District Council of Carpenters, 177 NLRB 500, 502 (1969), enfd., 454 F.2d 1116 (10th Cir. 1972); Meat Cutters Local Union No. 81 v. N.L.R.B., 147 U.S.App. D.C. 375, 379–380, 458 F.2d 794, 798–799 (1972); N.L.R.B. v. Locals Nos. 15–P and 272, Lithographers, 437 F.2d 55, 57 (6th Cir. 1971); N.L.R.B. v. Sheet Metal Workers, Local 49, 430 F.2d 1348, 1349 (10th Cir. 1970).

of fact, the proper test is whether the inference is supported by substantial evidence in the record. And under this standard, I see no reason to disagree with the Board's assessment of the effect of the union discipline upon the supervisor-employer relationship.

Further, the majority embraces a rule which makes the *type* of work a supervisor performs during a strike the determinative factor in section 8(b)(1)(B) cases involving the legality of union discipline. This distinction makes no sense from the standpoint of the Congressional purpose underlying sections 8(b)(1)(B), 2(3), and 14(a). The Board's present interpretation of section 8(b)(1)(B) was set out in *Local Union No. 2150 I. B. E. W.,* wherein it quoted from *Toledo Blade:*

> The Board's decision in the *San Francisco Mailers* case, underscores the . . . import of Section 8(b)(1) (B) as a general prohibition of a union's disciplining supervisor-members for their conduct in the course of representing the interests of their employers. As the Board held, such discipline by a union, even though the employer may have consented to the compulsory union membership of the supervisor under a union-security clause, is an unwarranted "interference with [the] employer's control over its own representatives," and deprives the employer of the undivided loyalty of the supervisor to which it is entitled.[10]

When a union disciplines a supervisor for crossing a picket line to perform rank-and-file work at the request of his employer, that discipline *equally* interferes with the employer's control over his representative and *equally* deprives him of the undivided loyalty of that supervisor as in the case where the discipline was imposed because of the way the supervisor interpreted the collective bargaining agreement or performed his "normal" supervisory duties. Thus, if the Board's construction of section 8(b)(1)(B) can be sustained, the majority's distinction of the type of work the supervisor performs during the strike would be without justification.

The Board's construction of 8(b)(1) (B), as prohibiting union discipline of supervisors for furthering the interests of their employer during disputes between the union and the employer, rests upon the legislative history of that section, and sections 2(3) and 14(a). The Supreme Court has recognized the fact "that labor legislation is peculiarly the product of legislative compromise of strongly held views, Local 1976, Carpenters' Union v. Labor Board, 357 U.S. 93, 99–100, 78 S.Ct. 1011, 1016–1017, 2 L.Ed.2d 1186, and that legislative history may not be disregarded merely because it is arguable that a provision may unambiguously embrace [or not embrace] conduct called in question. National Woodwork Mfrs. Assn. v. N. L. R. B., 386 U.S. 612, 619–620, 87 S.Ct. 1250, 18 L.Ed.2d 357."[11] When Congress was considering amendments to the National Labor Relations Act in 1947, it was acutely aware of the fact that unions had previously "taken' it upon themselves to say that management should not appoint any representative who [was] too strict with the membership of the union," and through the enactment of section 8(b)(1)(B) it endeavored "to prescribe a remedy in order to prevent such interferences."[12] Although this fact is highly pertinent to an evaluation of the proper scope of section 8(b)(1)(B), other legislative history surrounding the 1947 amendments must also be considered.

Section 8(b)(1)(B) must not be interpreted in a vacuum, but must be inter-

10. Local Union No. 2150, I.B.E.W., 192 NLRB No. 16, slip op. at 5 (1971).

11. N.L.R.B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 179, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123 (1967).

12. 93 Cong.Rec. 4266 (1947) (remarks of Sen. Ellender), in II Legislative History of the Labor Management Relations Act, 1947 at 1077.

preted in conjunction with the other 1947 amendments to the N.L.R.A. relating to supervisory personnel.[13] The fact that Congress decided to expressly exclude "supervisors" from the statutory definition of "employee" in section 2(3) is highly informative.

Congress was aware of the potential conflict between the obligations of foremen as representatives of their employers, on the one hand, and as union members, on the other. Section 2(3) evidences its *intent to make the obligations to the employer paramount*. That provision excepts foremen from the protection of the Act. Its purpose was to give the employer a free hand to discharge foremen as a means of *ensuring their undivided loyalty, in spite of any union obligations*. See H.Rep.No.245, 80th Cong., 1st Sess. 14–17 (1947); S.Rep.No.105, 80th Cong., 1st Sess. 3–5 (1947); L. A. Young Spring & Wire Corp. v. National Labor Relations Board, 1947, 82 U.S.App.D.C. 327, 163 F.2d 905, certiorari denied 1948, 333 U.S. 837, 68 S.Ct. 607, 92 L.Ed. 1121 * * * [14]

In *Meat Cutters* we considered this prior analysis of the 1947 legislative history and concluded that "[a] supervisor's obligations to his union simply cannot detract from the absolute duty, evidenced by section 8(b)(1)(B), which he owes to his employer when exercising his managerial authority." [15]

The majority correctly recognizes that sections 2(3) and 14(a) were expressly enacted to resolve the conflict of loyalties problem resulting from unionization of supervisors. However, it has completely misinterpreted the legislative so-

lution to that problem which Congress enacted in sections 2(3) and 14(a). There is just no support in the language of those sections or in the legislative history for the majority's interpretation that "Congress effectively gave employers an *option*" to prohibit unionization thereby ensuring undivided loyalty, or to permit unionization and thereby accept divided loyalty from their supervisors. What Congress *did* do in sections 2(3) and 14(a) was to solve the conflict of loyalties problem once and for all by taking supervisors completely out of the operation of the Act. Congress provided that there was nothing intended to prevent unionization of supervisors, even in rank-and-file unions, but even if unionized supervisors were to enjoy no protection from the Act. Congress did not give employers the means to *opt* for the undivided loyalty of their supervisors—it guaranteed it itself by enacting sections 2(3) and 14(a).

By the terms of sections 2(3), supervisors, as defined in section 2(11),[16] are excluded from the statutory definition of "employee", and thus taken out of the operation of the Act. This was the legislative solution to the conflict of loyalties problem experienced when supervisors unionized—thereby incurring certain rights under the Act and at the same time being subjected to union influence. Congress concluded that supervisors should be considered to be a part of management, and that the only way to guarantee the undivided loyalty of supervisors to their employer was to take them out of the operation and protection of the Act. Thus, the Senate Report, in noting what major

13. *See* sections 2(3), 2(11) and 14(a), 29 U.S.C. §§ 152(3), 152(11) and 164(a) (1970).

14. Carpenters Dist. Council of Milwaukee v. N.L.R.B., 107 U.S.App.D.C. 55, 57, 274 F.2d 564, 566 (1959) (emphasis added).

15. Meat Cutters Union Local 81 v. N.L. R.B., 147 U.S.App.D.C. 375, 381, 458 F. 2d 794, 800 (1972).

16. 29 U.S.C. § 152(11) (1970) provides: The term "supervisor" means any in-

dividual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

changes the Taft-Hartley Bill would make in the National Labor Relations Act, stated, "It eliminates the. genuine supervisor from the coverage of the act as an employee and makes clear that he should be deemed a part of management." S. Rep.No.105, 80th Cong., 1st Sess. 3 (1947), in I Legislative History of the Labor Management Relations Act at 409 [hereinafter cited as Legis.Hist.]. Similarly, the House Report noted that "[s]upervisors are management people," and concluded that

> Congress must exclude foremen from the operation of the Labor Act, not only when they organize into unions of the rank and file and into unions affiliated with those of the rank and file, but also when they organize into unions that claim to be independent of the unions of the rank and file.

H.R.Rep.No.245, 80th Cong., 1st Sess. 15–16 (1947), in I Legis.Hist. at 306–307 (emphasis in original). The legislative understanding was that even if supervisors organized, they were to be considered "management people" outside the operation of the act.

The explanatory comments of committee members also support this interpretation. Senator Taft explained:

> It is felt very strongly by management that foremen are part of management; that it is impossible to manage a plant unless the foremen are wholly loyal to the management. We tried various inbetween steps, but the general conclusion was that they must either be a part of management or a part of the employees. It was proposed that there be separate foremen's union not affiliated with the men's unions, but it was found that that was almost impossible; that there was always an affiliation of some sort; that foremen, in order to be successful in a strike, must have the support of the employees' union. A plant can promote other men to be foremen if nec-

essary. The tie-up with the employees is inevitable. *The committee felt that foremen either had to be a part of management and not have any rights under the Wagner Act, or be treated entirely as employees, and it was felt that the latter course would result in the complete disruption of discipline and productivity in the factories of the United States.*

93 Cong.Rec. 3952 (1947), in II Legis. Hist. at 1008–1009 (emphasis added). Likewise, Sen. Ball commented:

> The committee took the position that foremen are an essential and integral part of management, and that to compel management to bargain with itself, so to speak, by dividing the loyalties of foremen between the union and the employer, simply did not make sense, and inevitably would prove harmful. to the free-enterprise system. It might be stated that both the House and Senate bills deal with that subject in substantially the same way.

93 Cong.Rec. 5146 (1947), in II Legis. Hist. at 1496. *See also*, 93 Cong.Rec. A2012–13 (1947) (remarks of Rep. Meade), in I Legis.Hist. at 868–69; 93 Cong.Rec. 4411 (1947) (remarks of Sen. Smith), in II Legis.Hist. at 1148; 93 Cong.Rec. 4260 (1947) (remarks of Sen. Ellender), in II Legis.Hist. 1064–65.

The majority finds its option argument in the language and legislative history of section 14(a). Of course, the legislative history of that section is intimately bound up in that of section 2(3), and cannot be looked at separately.[17] The legislative history clearly indicates that section 14(a) was intended to do nothing more than make clear that an employer could not be compelled to treat his supervisors like other statutory "employees," even if they remained in the union. This follows directly from the exclusion of supervisors from the definition of "employee" in section 2(3).

17. *See, e. g.,* S.Rep. No. 105, 80th Cong., 1st· Sess. 5 (1947), in I Legis.Hist. at 411; Meat Cutters Local Union No. 81

v. N.L.R.B., 147 U.S.App.D.C. 375, 380–381, 458 F.2d 794, 799–800 (1972).

There is just nothing in the legislative history to indicate that Congress assumed that if an employer permitted his supervisors to remain in the union, he thereby impliedly accepted their dual loyalty.

What *is* eminently lucid from the legislative history is that Congress thought it was providing that even if a supervisor remained in a union, he had no protection or coverage under the act, and had to rely solely on the benevolence of his employer. Thus, the House Report states, "The bill does not forbid these people [*i. e.*, supervisors] to organize. It merely leaves their organizing and bargaining activities outside the provisions of the act." H.R.Rep.No.245, 80th Cong., 1st Sess. 23 (1947), in I Legis. Hist. at 314. *See also,* S.Rep.No.105, 80th Cong., 1st Sess. 5 (1947), in I Legis.Hist. at 411; S.Min.Rep.No.105, pt. 2, 80th Cong., 1st Sess. 39 (1947), in I Legis.Hist. at 501. Again, the remarks of the committee are informative. For example, Rep. Hartley noted, "This bill also exempts supervisors from the compulsory features of the National Labor Relations Act. In other words, this bill does not bar them from organizing but they cannot obtain the benefits of the act." 93 Cong.Rec. 3533 (1947), in I Legis.Hist. at 613. *See also,* 93 Cong. Rec. 3952 (1947) (remarks of Sen. Taft), in II Legis.Hist. at 1008.

The fact that section 14(a) also provides that "Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization" does not in any way support the majority's option argument. This statement was *not* intended to "expressly [provide] that foremen could unionize" at the employer's will, as the majority argues, for there was nothing in the 1947 Amendments which would have prevented such unionization.[18] The statement was without material effect, and "was included presumably out of an abundance of caution." H.Conf.Rep.No.510, 80th Cong., 1st Sess. 60 (1947), in I Legis.Hist. at 564.[19] This almost superfluous provision obviously cannot legitimately serve as a cornerstone for any interpretation of the legislative solution to the conflict of loyalties problem enacted by the 80th Congress.

The majority maintains that the case law has always assumed that once an employer permits his supervisors to join unions, he can no longer claim their undivided loyalty in disputes with the union. Yet the cases it cites for this proposition all pre-date the Board's decision in *Oakland Mailers,* wherein the Board faced the issue of union discipline of supervisors for the first time and admittedly expanded the interpretation of section 8(b)(1)(B).[20] The cases since *Oakland Mailers* indicate that merely because an employer may have consented to the compulsory union membership of his supervisors under a union-security provision does not negate his right to the full protection of section 8(b)(1)(B). *See* Meat Cutters Union Local 81 v. N. L. R. B., 147 U.S.App.D. C. 375, 458 F.2d 794 (1972); Toledo Locals Nos. 15–P and 272, 175 NLRB 1072,

18. S.Rep. No. 105, 80th Cong., 1st Sess. 28 (1947), in I Legis.Hist. at 434 states, "Section 14: This is a new section which *makes it clear* that the amendments to the act do not prohibit supervisors from joining unions, but that it is contrary to national policy for other Federal or State agencies to compel employers who are subject to the National Board to treat supervisors as employees for the purpose of collective bargaining or organizational activity" (emphasis added).

19. The legislative history contains a number of references to the fact that there was no intent to prevent unionization of supervisors, but merely to take them out of the operation of the Act—thus leaving them only with self-help protections. *See* pp. 1178, 1179, *supra.*

20. The Board informed us at oral argument, and my own research has not contradicted their assertion, that *Oakland Mailers* was the first case in which it faced the issue of the extent to which section 8(b)(1)(B) prevents union discipline of supervisors/members for performing managerial duties.

1080 (1969), enfd., 437 F.2d 55 (6th Cir. 1971); Local Union No. 2150, I. B. E. W., 192 NLRB No. 16, slip op. at 5 (1971). And in *Meat Cutters* we specifically rejected the union's argument that section 14(a) expressed an intent to subject supervisor/members to the full control of the union, concluding that it is readily apparent "when all the relevant 1947 amendments to the Act are considered in concert, that Congress did not intend thereby to allow unions to subvert the 'undivided loyalty' it clearly believed such managerial personnel owe to their respective employers." [21]

In my view the Board's interpretation of section 8(b)(1)(B) as proscribing union discipline of supervisors for furthering the interests of their employer by performing struck work expressly at his request does not stretch that section to the breaking point, but is fully justified in light of the legislative history and the other sections dealing with supervisors.

### III.

The majority attempts to draw significant support for its construction of section 8(b)(1)(B) from *Allis-Chalmers*,[22] which it characterizes as "indistinguishable from these cases." It is my view that a close analysis of *Allis-Chalmers* and *Scofield* [23] reveals nothing which would relieve the unions from responsibility under section 8(b)(1)(B) for these fines. First, it is vitally important to remember that *Allis-Chalmers* involved section 8(b)(1)(A),[24] not

8(b)(1)(B).[25] While both contain the common language "to restrain or coerce," the two provisions protect completely different interests in quite different ways. Section 8(b)(1)(A) was only intended to impose some slight controls upon the union-*employee* relationship, and the legislative history makes clear that Congress did not intend extensive regulation of the *internal* union-employee/member relationship. See N. L. R. B. v. The Boeing Co., 412 U.S. 67, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973); N. L. R. B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 183–195, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967). See also, National Maritime Union, 78 NLRB 971, 982–987 (1948), enfd. 175 F.2d 686 (2d Cir. 1949), cert. denied, 338 U.S. 954, 70 S. Ct. 492, 94 L.Ed. 589 (1950). Section 8(b)(1)(B), on the other hand, was intended to regulate the *external* union-*employer* relationship. No amount of union coercion or interference with an employer's selection or control of his representatives for the purpose of collective bargaining or adjustment of grievances was permitted.

Second, in upholding the union fines in *Allis-Chalmers* and *Scofield,* while the Supreme Court did not rely upon the express language of the proviso to section 8(b)(1)(A),[26] as the Labor Board had originally done in Minneapolis Star and Tribune Co., 109 NLRB 727 (1954), it did draw "cogent support" for its decision from it.[27] See N. L. R. B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 191–192, 87 S.Ct. 2001, 18 L.Ed.2d 1123

---

21. 147 U.S.App.D.C. at 381, 458 F.2d at 800.

22. 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed. 2d 1123 (1967).

23. 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed. 2d 385 (1969).

24. 29 U.S.C. § 158(b)(1)(A) (1970) provides:
 (b) It shall be an unfair labor practice for a labor organization or its agents—
 (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided,* That this paragraph shall

not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein;

25. *See* note 1, *supra.*

26. *See* note 24, *supra.*

27. *Compare* Booster Lodge No. 405, Int. Assn. of Machinists v. N.L.R.B., 148 U.S. App.D.C. 119, 125, 459 F.2d 1143, 1149 (1972), aff'd in part, 412 U.S. 84, 93 S.Ct. 1961, 36 L.Ed.2d 764 (1973) *with* Meat Cutters Union Local 21 v. N.L.R.B., 147 U.S.App.D.C. 375, 381, 458 F.2d 794, 800 (1972).

(1967); Scofield v. N. L. R. B., 394 U.S. 423, 428, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969). *See also,* Gould, Some Limitations Upon Union Discipline Under the National Labor Relations Act; The Radiations of Allis-Chalmers, 1970 Duke L. J. 1067, 1128 (1970). The applicability of that proviso, however, *is* clearly limited to section 8(b)(1)(A). It is not a part of section 8(b)(1)(B), which directly regulates only the union-employer relationship.[28] Therefore, to the extent that *Allis-Chalmers* and *Scofield* draw "cogent support" from that proviso for their holdings, that rationale cannot lend support to disciplining "supervisors" where the cases arise under section 8(b)(1)(B).

In the majority's view the "one thing that is clear" from *Allis-Chalmers* is that there is no overriding policy of the labor laws which prohibits reasonable union fines levied against its members who cross a lawful picket line to perform rank-and-file struck work. A union has a right to assure solidarity in its ranks by imposing fines to prevent strike breaking by its members. This reasoning, the majority argues, is directly applicable to the situation here. The defect in this argument is that it fails to recognize the fundamental distinction which Congress made between *employees* and *supervisors,* even if the latter were members of a union. In *Allis-Chalmers* the Court was faced only with the situation of union discipline of *employee*/members. Thus, the Court there began by noting that

National labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions. . . . The employee may disagree with many of the union decisions but is bound by them. "The majority rule concept is today unquestionably at the center of our federal labor policy." [29]

It was in this context that the Court proceeded to acknowledge the importance of a union's power to discipline its members to protect against erosion of its status. "The power to fine or expel a strikebreaker 'is essential if the union is to be an effective bargaining agent.' " [30]

In contrast, in the instant cases we are confronted with union discipline of *supervisor* members, which Congress said in the Taft-Hartley amendments were to be "deemed a part of management." [31] It was largely for the reason that because a usual union member *is* subservient to the will of the majority, Congress took supervisors out of the operation of the Act—to make them subservient to the will of the employer and *not* the union.[32] Certainly management has an equal right under our federal labor policy to promote strike solidarity among its supervisory personnel as does a union to promote solidarity from its

---

28. *See* San Francisco-Oakland Mailers' Union No. 18, International Typographical Union, 172 NLRB 2173 (1968); Price v. N.L.R.B., 373 F.2d 443, 446 (9th Cir. 1967), cert. denied, 392 U.S. 904, 88 S.Ct. 2051, 20 L.Ed.2d 1363 (1968); Meat Cutters Union Local 81 v. N.L.R.B., 147 U.S.App.D.C. 375, 381–382, 458 F.2d 794, 800–801 (1972). *See also* II Legis.Hist. at 1139, 1141, and 1200.

29. 388 U.S. at 180, 87 S.Ct. at 2006 (footnote omitted).

30. N.L.R.B. v. Marine Workers, 391 U.S. 418, 423, 88 S.Ct. 1717, 1721, 20 L.Ed.2d 706 (1968) quoting from N.L.R.B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 181, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967).

31. S.Rep. No. 105, 80th Cong., 1st Sess. 3 (1947), in I Legis.Hist. at 409.

32. *See* majority opinion at 1164, *supra.*

members.[33] Where these two rights clash, as they do here, the legislative pronouncements of sections 2(3), 14(a) and 8(b)(1)(B) indicate to me that the interest of the employer in having loyal supervisors under his control must prevail.

Further, as the majority acknowledges, Supreme Court decisions subsequent to *Allis-Chalmers* have emphasized that the *Allis-Chalmers* rationale only permits "a union * * * to enforce a properly adopted rule which reflects a legitimate union interest [and] *impairs no policy Congress has imbedded in the labor laws.*" Scofield v. N. L. R. B., 394 U.S. 423, 430, 89 S.Ct. 1154, 1155, 22 L. Ed.2d 385 (1969) (emphasis added), *and see* 394 U.S. at 429, 432, 89 S.Ct. 1154. *See* N. L. R. B. v. The Boeing Co., 412 U.S. 67, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973); N. L. R. B. v. Marine Workers, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968); Booster Lodge No. 405, Int. Assn. of Machinists v. N. L. R. B., 148 U.S.App.D.C. 119, 126, 459 F.2d 1143, 1150 (1972), aff'd in part, 412 U.S. 84, 93 S.Ct. 1961, 36 L.Ed.2d 764 (U.S. May 21, 1973).[34] And, as previously developed, sections 2(3), 14(a) and 8(b)(1)(B) do embody such a congressional policy—to ensure the undivided loyalty of supervisors to their employer without interference from unions—which would be impaired by these disciplinary fines. Whenever union action has the effect of impermissibly inhibiting an employer with respect to his choice of loyal representatives it is apparent that an express federal labor policy is being violated, and it necessarily follows that the rationale underlying *Allis-Chalmers* and *Scofield* cannot be availed to nullify the section 8(b)(1)(B) violation.

33. The Senate Report indicates that in exempting supervisors from the operation of the Act, Congress was concerned about restoring some semblance of a balance of collective bargaining power between unions and employers. The Report found that the organization of supervisors with the resulting rights under the National Labor Relations Act "probably more than any other single factor ha[d] upset any real balance of power in the collecting-bargaining process . . . ." S.Rep. No. 105, 80th Cong., 1st Sess. 3 (1947), in I Legis.Hist. at 409.

34. *See also*, N.L.R.B. v. International Molders and Allied Workers Union, 442 F.2d 92, 94 (7th Cir. 1971).